David Michael GIDDENS, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–07–00076–CR.

Court of Appeals of Texas,
Waco.

April 16, 2008.
Rehearing Overruled May 13, 2008.

Joseph L. Sheppard, Keith Bradley, Bradley & Cain, LLC, Burleson, Patrick J. Garner, Fort Worth, for Appellant.

Dale S. Hanna, Johnson County Dist. Atty., Cleburne, for Appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

BILL VANCE, Justice.

A jury found David Michael Giddens guilty of both capital murder and injury to a child by omission in the death of his three-month-old adopted son. The capital murder conviction carried an automatic life sentence, and the jury assessed punishment on the injury-to-a-child-by-omission charge at life in the Texas Department of Criminal Justice with a $10,000 fine. Giddens appeals on nine issues. In the first seven issues, Giddens challenges the jury charge and the legal and factual sufficiency of the evidence to support his convictions. In the remaining two issues, Giddens complains of a *Batson* violation and challenges the trial court's denial of his motion to suppress. We will affirm.

## Background

The facts surrounding this case are largely undisputed. In August of 2005, Giddens and his wife Lynn adopted two twin boys, Nicholas and Gary, in Grand Rapids, Michigan. There, Lynn and Giddens were given care, custody and control of the twins and obtained the necessary court order to return to Texas with them. During the day, while Lynn was at work, Giddens cared for the boys with the help of Lela Walker, Lynn's aunt. Giddens stayed at home because of progressive and recurring symptoms of multiple sclerosis.

On February 8, 2006, at approximately 4:00 p.m., Giddens came home from picking up his adopted daughter, Hannah, from school and came into the living room to feed Nicholas. Nicholas, who had been suffering from thrush, began crying and refused to take the bottle. Walker testified that Giddens then got angry, yelled "I'm tired of this!", threw the bottle on the couch, and quickly carried Nicholas to his crib where Giddens was heard, through the child-monitor, twice striking Nicholas. In his statement given to police, Giddens stated that after striking Nicholas, he stopped crying and went limp.

At approximately 6:50 p.m., Lynn returned home and checked on the twins before leaving to take Hannah to church at 7:00 p.m. After picking up Hannah from church, having dinner and, lying down to rest, Lynn was awakened by Gary's cry at around 1:00 a.m. After changing and feeding Gary, Lynn wondered why Nicholas was not crying to be fed as well. When she checked on Nicholas, she noticed that he was cold to the touch and non-responsive. She called 9-1-1, and medical personnel arrived, but they were unable to revive Nicholas.

An autopsy of Nicholas was done that afternoon. Johnson County Assistant Medical Examiner Joanna Borkowski, M.D., was the first doctor to perform an autopsy on Nicholas. During her initial review, Dr. Borkowski opened Nicholas's skull and noticed that blood had collected inside. Upon further examination, Dr. Borkowski determined that Nicholas had suffered multiple, complex fracturing to the skull, hemorrhaging, and a rectangular depression in the skull. Because of the pliability of an infant's head, Dr. Borkowski realized that the type of injuries sustained by Nicholas were not accidental and could have only been sustained by an intentional severe blow to the head. For this reason, Dr. Borkowski stopped the autopsy and called police. Nicholas was later re-examined by two other medical examiners, Dr. Krouse and Dr. Rains, whose findings were similar to Dr. Borkowski's.

The police went to the Giddenses' home and requested an interview. Giddens subsequently gave three written statements to police.

During the first interview, which took place in the office of Cleburne Police Department Detective Bill Black, Giddens was asked to give a chronology of events leading up to Nicholas's injury. Giddens stated that he put Nicholas to bed at about 6:30 p.m. and that he did not realize anything was wrong with the child until Lynn woke him up later that night. Following Giddens's statement, the police's collective information, including the autopsy results and the statement by Walker, led to a determination that Giddens was the most likely person to have caused Nicholas's injury.

Giddens was interviewed a second time, and he acknowledged that he had not been completely truthful in his first interview. In his second statement, Giddens said that after Lynn had left to take Hannah to church, he picked Nicholas up for a feeding and, on the way back from the kitchen, he stumbled. He said that Nicholas's head hit the wall or doorframe and then he accidentally dropped Nicholas on the hardwood floor. He indicated that Nicholas had become lethargic, with his breathing shallow and gasping, and that although he realized these were signs of injury, he took no action and failed to inform Lynn when she returned home. Realizing that Giddens had volunteered information indicating he was guilty of injury to a child by omission, Fox later arrested Giddens.

After his arrest, Giddens agreed to take a polygraph examination. As the exam was beginning, Giddens asked the examiner to stop the questioning, stating that he had been untruthful during his second statement, and agreed to give a third statement. In this statement, Giddens admitted to (1) being angry at Nicholas, (2) striking him twice with an open hand out of anger, (3) stumbling with the child, and (4) that his failure to get help for Nicholas led to the child's death.

The State filed a five-count indictment against Giddens consisting of the charges of (1) capital murder, (2) murder, (3) felony murder, (4) injury to a child, and (5) injury to a child by omission. Before trial, the State dropped counts two through four and proceeded with the capital murder and injury-to-a-child-by-omission counts. The jury found Giddens guilty of both charges.

**Motion to Suppress**

■ Giddens filed a pretrial motion to suppress his written statement to police, arguing that this statement should have been suppressed because it was obtained through a prolonged coercive interrogation. The trial court denied the motion. In his ninth issue, Giddens argues that the

court abused its discretion in denying this motion.

■■■ In a hearing on a motion to suppress, the trial judge is the sole and exclusive trier of fact and judge of the credibility of the witnesses as well as the weight to be given to their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990). If the court's resolution of a controverted issue is supported by the record, a reviewing court should not disturb that decision. *Muniz v. State*, 851 S.W.2d 238, 252 (Tex.Crim.App.1993).

On February 9, 2006, around 6:00 p.m. Detective Black was contacted by fellow officer, Commander Laseman. Laseman informed Black of the medical examiner's findings that Nicholas had suffered skull fractures indicating that his death was not accidental. Together, Laseman and Black went to Giddens's home and requested an interview with Giddens and his wife. At the police station, Giddens was taken to Black's office while another investigator interviewed Giddens's wife. Giddens's interview began at approximately 7:30 p.m., and Officer Black began by asking Giddens to give a timeline of the events that occurred on the day of Nicholas's death. As Giddens answered Officer Black's questions, another detective typed the responses on his computer. The interview ended at approximately 10:00 p.m., with Giddens reviewing and signing a printed copy of the witness statement.

In this first statement, Giddens indicated that there was nothing abnormal about Nicholas's behavior when he put him to bed at 6:30 p.m. and that he did not realize anything was wrong with him until his wife alerted him later that night.

After interviewing Walker and Lynn and receiving the autopsy information, the police believed that Nicholas's death was not an accident and that Lynn, Lela, and Giddens were possible suspects. Specifically,

when Lela was questioned, she mentioned that Giddens had anger management problems and on the day of the incident, Giddens had taken Nicholas to the child's bedroom. She then heard what she believed were two slaps. Based on this information, the police believed that Giddens was the most likely person to have caused Nicholas's injury. For this reason, Detective Fox further questioned Giddens after his interview with Officer Black.

At this second interview, Fox first laid out the aforementioned evidence implicating Giddens and asked Giddens to be honest about what had happened to Nicholas. Fox began taking down Giddens's second statement in which Giddens admitted to dropping Nicholas and being untruthful during his first interview. Fox printed a copy of the typed statement, read it to Giddens, and then allowed him an opportunity to read over it and make any changes. Following the completion of the second interview, Giddens was arrested and taken to jail.

The next day, Black met with Giddens and asked if he would be willing to travel to Arlington to take a polygraph test. Giddens agreed. Before taking the test, Officer Wood administered the appropriate *Miranda* warnings and read Giddens his first two statements. Giddens then indicated that his statement to Fox had not fully disclosed all of the details surrounding Nicholas's death and he asked to give a third written statement. Wood then took down Giddens's third statement, which took approximately fifteen to twenty minutes.

■■■ To be admissible, a confession must be voluntarily given and free from coercion or improper influences. *Wyatt v. State*, 23 S.W.3d 18, 23 (Tex.Crim.App. 2000); *Kearney v. State*, 181 S.W.3d 438, 443 (Tex.App.-Waco 2005, pet. ref'd.); *Sen-*

*dejo v. State,* 953 S.W.2d 443, 447–48 (Tex. App.-Waco 1997, pet. ref'd.). A confession is involuntary or coerced if the totality of the circumstances demonstrate the defendant did not make the decision to confess of his own free will. *Delao v. State,* 235 S.W.3d 235, 239 (Tex.Crim.App.2007); *Green v. State,* 934 S.W.2d 92, 99 (Tex. Crim.App.1996).

■■■ When reviewing a suppression-hearing ruling, we view the evidence in the light most favorable to the trial court's ruling. *See State v. Terrazas,* 4 S.W.3d 720, 725 (Tex.Crim.App.1999); *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim. App.1996). Voluntariness is determined by looking at the totality of the circumstances. *See Griffin v. State,* 765 S.W.2d 422, 427 (Tex.Crim.App.1989). The trial court is the sole judge of the weight and credibility of the evidence, and the court's findings may not be disturbed on appeal absent a clear abuse of discretion. *Alvarado,* 912 S.W.2d at 211. As such, abuse of discretion is the appropriate standard of review for challenges to the trial court's admission of evidence. *See Angleton v. State,* 971 S.W.2d 65, 67 (Tex.Crim.App. 1998).

We conclude the trial court did not abuse its discretion in denying Giddens's motion to suppress and allowing his written statements into evidence. Although Giddens was questioned over a five-hour period and the officers were aware that Giddens had multiple sclerosis, nothing in the record reflects that he was unwilling to talk or that his statements were made against his will. Giddens was initially interviewed in Officer Black's office—a non-coercive environment. During this two and one-half hour interview, Giddens was asked to establish a chronological timeline of the events surrounding Nicholas's injury. Officer Black was cordial and non-confrontational and offered Giddens some-

thing to drink three times. He also asked Giddens if he wanted to stop and stretch, which Giddens refused.

Giddens was then interviewed by Officer Fox after a twenty-minute restroom break. This interview took place in Fox's office and lasted approximately two and one-half hours, including a ten-minute break that was offered to Giddens. It appears that the length of this interview was largely due to Giddens's admission that he failed to tell Black the truth about Nicholas's injuries. Based on the statement given to Fox, Giddens was arrested in the early morning and was not confronted by another officer until the afternoon that day. Giddens was given substantial breaks, offered something to drink, and was not subjected to undue influence.

Texas courts have found confessions to be voluntary under far more coercive circumstances than are found here. *See, e.g., Fineron v. State,* 201 S.W.3d 361 (Tex. App.-El Paso 2006, no pet.) (seven hours of questioning did not render confession involuntary where appellant given water, allowed breaks, and offered food and cigarettes); *Vasquez v. State,* 179 S.W.3d 646, 658 (Tex.App.-Austin 2005, pet. granted) (seven hours of "increasingly coercive interrogation by two trained homicide detectives," isolation from wife, and having shoes taken did not render confession involuntary where appellant was repeatedly told he could leave, and was given his car keys, yet chose to continue talking); *Bell v. State,* 169 S.W.3d 384, 391–92 (Tex.App.-Fort Worth 2005, pet. ref'd.) (eight hours of questioning while in handcuffs and leg shackles did not render confession involuntary where appellant never indicated he did not want to answer any more questions or wanted to speak to attorney and never requested food, water, or bathroom breaks). We overrule Giddens's ninth issue.

### Batson Motion

 In issue eight, Giddens argues that the State violated *Batson* by using its peremptory strikes during voir dire to remove three prospective jurors. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). Giddens claims that the three prospective jurors were struck by the State because all of the jurors knew someone who suffered from multiple sclerosis. Giddens argues that knowing someone afflicted by multiple sclerosis places a prospective juror into a cognizable, protected group, and the State's use of its peremptory challenges to remove these jurors was discriminatory, and as such, a violation of *Batson.*

Under *Batson,* a prosecutor is prohibited by the Fourteenth Amendment from striking potential jurors based on their race. *Batson,* 476 U.S. at 89, 106 S.Ct. 1712; *see also* Tex.Code Crim. Proc. Ann. art. 35.261 (Vernon 1989) (codifying *Batson*).

Texas courts have extended *Batson* to civil trials as well as to challenges based on ethnicity and gender. *See Wamget v. State,* 67 S.W.3d 851, 857 (Tex.Crim.App. 2001); *Casarez v. State,* 913 S.W.2d 468, 475 (Tex.Crim.App.1994). No court has addressed the issue of whether a prosecutor can strike someone for being physically impaired, although one court has held that a strike based on a panel member's association with a handicapped person does not violate *Batson. Morgan v. City of Albuquerque,* 25 F.3d 918, 920 (10th Cir.1994); *but cf.* David G. Hart and Russell D. Cawyer, *Batson and Its Progeny Prohibit the Use of Peremptory Challenges Based Upon Disability and Religion,* 26 Tex. Tech L.Rev. 109, 112–13 (1995) (arguing that strikes based on a panel member's disability are unconstitutional). We have not found, nor has Giddens cited, any case law extending *Batson* to those who have known someone with a disability. We decline to do so today. We overrule Giddens's eighth issue.

### Jury Charge Issues

 Giddens's first three issues complain of jury charge error. In *Almanza v. State,* the Court of Criminal Appeals prescribed the manner in which jury charge error is reviewed on appeal. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim.App.1985) (op. on reh'g). First, we must determine whether error exists in the jury charge. *Hutch v. State,* 922 S.W.2d 166, 170 (Tex.Crim.App.1996). Second, we must determine whether the error caused sufficient harm to require reversal. *Id.* at 170–71. The degree of harm required for reversal depends on whether the complaint was preserved. *Id.* at 171. A complaint properly preserved by an objection to the charge will require reversal "as long as the error is not harmless." *Id.* (citing *Almanza,* 686 S.W.2d at 171).

In his first issue, Giddens claims that the charge allowed the jury to convict him of capital murder under the wrong culpable mental state. Giddens argues that the jury charge and the indictment erroneously used "knowingly" as the culpable mental state for capital murder under section 19.03(a)(8), instead of the required culpable mental state "intentionally." Tex. Pen. Code Ann. § 19.03(a)(8) (Vernon Supp. 2007). The State argues that knowingly is the proper culpable mental state for both the indictment and the jury charge.

 The court's charge to the jury should correctly instruct the jury on the law relating to the indicted offense. *Johnson v. State,* 571 S.W.2d 170, 173 (Tex. Crim.App.1978). Capital murder under section 19.03(a)(8) requires, *inter alia,* a murder to have been committed under sec-

tion 19.02(b)(1). TEX. PEN.CODE ANN. § 19.03(a)(8). The plain language of section 19.02(b)(1) states that a person commits the offense of murder if the actor "intentionally or knowingly" causes the death of an individual. TEX. PEN CODE ANN. § 19.02(b)(1) (Vernon 2003). In cases of statutory construction, an appellate court gives effect to the plain meaning of the statutory text, unless the language is ambiguous or the plain meaning leads to absurd consequences that the legislature could not possibly have intended. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim. App.1991). As such, knowingly can be an appropriate culpable mental state for capital murder. Additionally, the Penal Code clearly articulates when the culpable mental state "intentionally" is required for a capital murder conviction: section 19.03(a)(2) states that a person commits the offense of capital murder if the "person *intentionally* commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat." TEX. PEN.CODE ANN. § 19.03(a)(2) (emphasis added).

The legislature has been clear that under some subsections of the capital murder statute, it must be an intentional murder, and in others it may be an intentional *or* a knowing murder with an additional element. *See Thompson v. State*, 236 S.W.3d 787, 793 (Tex.Crim.App.2007). Because the statute is clear that a defendant can be found guilty of capital murder under subsection 19.03(a)(8) when he knowingly caused the death of a child less than six years of age, we overrule Giddens's first issue.

In his next two issues, Giddens argues that because the trial court erroneously allowed a conviction for capital murder and injury to a child by omission using "knowingly" as the culpable mental state, this culpable mental state was in effect transformed under Penal Code section 6.04 (the doctrine of transferred intent) into "intentionally." Giddens then claims that because the culpable mental state "intentionally" is necessary for both convictions, under *Apprendi* "intentionally" should have been included in the indictment and found by the jury. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that any factor which increases punishment must be pled in the indictment and found by the factfinder beyond a reasonable doubt.). Giddens maintains that because neither occurred, the trial court erred and therefore his capital murder conviction should be reformed to murder or remanded for a new punishment hearing.

Because a conviction for capital murder and injury to a child by omission can both be obtained by using the culpable mental state of "knowingly," there is no *Apprendi* violation as alleged by Giddens. Thus, the culpable mental state of "intentionally" did not need to be pled in the indictment, made part of the charge, or found by the jury. We overrule Giddens's second and third issues.

### Legal and Factual Sufficiency

Giddens next four issues challenge the legal and factual sufficiency of the evidence. In his fourth and sixth issues, Giddens contends that the evidence was both legally and factually insufficient to support the capital murder conviction. He specifically contends in each issue that the evidence was insufficient to prove that the result was intentionally or knowingly caused.[1]

---

1. Giddens challenges only the sufficiency of the evidence to prove a culpable mental state;

When reviewing a challenge to the legal sufficiency of the evidence to establish the elements of a penal offense, we must determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Our duty is to determine if the finding of the trier of fact is rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman v. State*, 828 S.W.2d 418, 422 (Tex.Crim.App. 1992). In doing so, any inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App.2000).

In a factual sufficiency review, we ask whether a neutral review of all the evidence, though legally sufficient, demonstrates either that the proof of guilt is so weak or that conflicting evidence is so strong as to render the factfinder's verdict clearly wrong and manifestly unjust. *Watson v. State*, 204 S.W.3d 404, 414–15 (Tex.Crim.App.2006); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). "The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact." *Johnson*, 23 S.W.3d at 7 (quoting *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996)). The appellate court "does not indulge in inferences or confine its view to evidence favoring one side of the case. Rather, it looks at all the evidence on both sides and then makes a predominantly intuitive judgment...." *Id.* (quoting William Powers and Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Texas L. REV. 515,

accordingly, we will address whether legally and factually sufficient evidence supports the

519 (1991)). The nature of a factual sufficiency review authorizes an appellate court, although to a very limited degree, to act as the so-called "thirteenth juror" to review the factfinder's weighing of the evidence and disagree with the factfinder's determination. *Watson*, 204 S.W.3d at 416–17.

*Capital Murder*

 For the State to prove that Giddens committed capital murder, it was required to prove that he intentionally or knowingly caused Nicolas's death. *See* TEX. PEN.CODE ANN. §§ 19.02(b)(1), 19.03(a)(8). Proof of a culpable mental state almost invariably depends upon circumstantial evidence. *Montgomery v. State*, 198 S.W.3d 67, 87 (Tex.App.-Fort Worth 2006, pet. ref'd); *Morales v. State*, 828 S.W.2d 261, 263 (Tex.App.-Amarillo 1992), *aff'd*, 853 S.W.2d 583 (Tex.Crim. App.1993). A person acts "knowingly," or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. TEX. PEN.CODE ANN. § 6.03(b). Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995). In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge. *Id.* Additionally, a culpable mental state can be inferred from the acts, words, and conduct of the accused. *Id.*

Viewed in the light most favorable to the verdict, the evidence at trial showed that the extent and manner of Nicolas's injuries contributed to a showing of intent. Dr.

culpable mental state of intentionally or knowingly.

Borkowski, Dr. Krouse and Dr. Raines—all experienced medical examiners—established that the injuries sustained by Nicholas were not accidental. These doctors all emphasized that because a baby's skull is pliable, it is more difficult to injure than an adult bone. The fractures found in Nicholas's skull were complex and unlike those found when a child is simply dropped during normal activities. Nicholas's skull had a rectangular depression on the right side that resulted in complex, multiple fracturing and subdural and subarachnoid hemorrhaging.

Dr. Borkowski was clear that the injury sustained by Nicholas "could not" have happened as Giddens described, testifying that the injury was far too severe to have occurred from an accidental dropping, but was similar to those that would result from being dropped from a third story window. The testimony of Dr. Borkowski and Dr. Raines strongly indicated that Nicholas's injuries were knowingly and intentionally caused by a severe blow to the child's head. Moreover, according to Dr. Krouse and Dr. Rains, because Nicholas had no other injuries, this absence precluded the possibility that Nicholas's injuries resulted from being dropped and crushed by Giddens.

The evidence of Nicholas's injuries was compelling and overwhelming. This evidence established that the injuries were not the result of an accident but an instance of blunt force. Viewing the evidence—in particular the extensive medical evidence regarding Nicholas's injuries—under the appropriate standard, we conclude it is both legally and factually sufficient to establish that appellant intentionally or knowingly caused Nicholas's death. We overrule Giddens's fourth and sixth issues.

*Injury to a child by omission*

■ The State also charged Giddens with injury to a child under Penal Code section 22.04(a), which provides in part that "[a] person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child ... serious bodily injury ... if the actor has a legal duty or statutory duty to act ..." TEX. PEN.CODE ANN. § 22.04(a), (b) (Vernon 2003). Giddens argues that there is no evidence that he intended or knew that serious bodily injury would occur from his failure to provide adequate medical assistance to Nicholas after he received a blow to the head.

■ Injury to a child is a result-oriented offense. *Alvarado v. State*, 704 S.W.2d 36, 38–39 (Tex.Crim.App.1985). The State was thus required to prove that Giddens either had the specific intent to cause and did intentionally cause serious bodily injury to Nicholas by denying him reasonable medical treatment or that Giddens knowingly caused serious bodily injury to the child by denying the child reasonable medical treatment. *See* TEX. PEN.CODE ANN. § 22.04(a)(1); *Dusek v. State*, 978 S.W.2d 129, 134–35 (Tex.App.-Austin 1998, pet. ref'd). Proving only that Giddens failed to provide medical care after Nicholas suffered serious bodily injury would not satisfy the State's burden of causation under the statute. *See* TEX. PEN.CODE ANN. § 22.04(a)(1); *Dusek*, 978 S.W.2d at 134–35.

As with the capital murder charge, Giddens attacks only the sufficiency of the evidence to prove the culpable mental state of "knowingly." Consequently, we limit our discussion to that element. The record reflects that, as a part of the adoption process, Giddens was required to take an instructional course on "shaken baby syndrome" (SBS). As a part of this

course, Giddens was instructed on avoidance and prevention of SBS, how to recognize its warning signs, and the necessity of seeking immediate medical care upon seeing any warning signs. Thus, Giddens was aware of the signs of head trauma to an infant and what to do if such signs occurred. In Giddens's statements to Detective Fox and Richard Wood, he acknowledged that Nicholas showed signs of SBS injury. He stated that Nicholas had stopped crying and became lifeless and limp. He also stated that Nicholas was non-responsive, lethargic, and although he was still breathing, his breath was shallow and gasping. Giddens also stated that after Nicholas's injury, he did not know if he was alive or not. After Giddens noticed that Nicholas was suffering from trauma, he placed him in his crib, took a shower, and then laid down for a nap. Giddens never went back to check on Nicholas or render aid. The evidence indicated that Giddens was aware that failing to get medical care for Nicholas's head injury was reasonably certain to cause the infant serious bodily injury. Therefore, the evidence was legally and factually sufficient to support Giddens's conviction for knowingly causing injury to a child by omission. We overrule Giddens's issues five and seven.

## Conclusion

Having overruled all of Giddens's issues, we affirm the trial court's judgment.

Chief Justice GRAY concurs in the result. A separate opinion will not issue.