

# IN THE
# TENTH COURT OF APPEALS

————————

### No. 10-08-00401-CR

**ERIC WILLIAMS,**

                                                                        **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                                        **Appellee**


————————

### From the 54th District Court
### McLennan County, Texas
### Trial Court No. 2007-1234-C2


## MEMORANDUM  OPINION


A grand jury charged Eric Williams by indictment with the murder of Erica Rivera.  After the jury found him guilty, Williams pleaded true to an enhancement allegation and a habitual allegation in the punishment phase.  The jury assessed a life sentence.  Raising three issues, Williams appeals.  We will affirm.

The first issue asserts that the evidence is legally insufficient to show that Williams had the specific intent to kill Erica or to cause her serious bodily injury.  When reviewing a challenge to the legal sufficiency of the evidence to establish the elements of

a penal offense, we must determine whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Our duty is to determine if the finding of the trier of fact is rational by viewing all of the evidence admitted at trial in the light most favorable to the verdict. *Adelman v. State,* 828 S.W.2d 418, 422 (Tex. Crim. App. 1992). Any inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State,* 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

> In reviewing the sufficiency of the evidence, we should look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Cordova v. State,* 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Johnson v. State,* 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) ("[i]t is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances."); *Barnes v. State,* 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Alexander v. State,* 740 S.W.2d 749, 758 (Tex. Crim. App. 1987). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara,* 152 S.W.3d at 49. On appeal, the same standard of review is used for both circumstantial and direct evidence cases. *Id*.
>
> . . .
>
> Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.
>
> . . .

[C]ourts of appeals should adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.

*Hooper v. State*, 214 S.W.3d 9, 13, 15-17 (Tex. Crim. App. 2007).

The evidence viewed in the light most favorable to the verdict shows that the youngest of Erica's three children was fathered by Williams, but toward the end of her pregnancy with that child, she began living with another man and lived with him for about five years. Thereafter, Erica and Williams had a sometimes "boyfriend-girlfriend" relationship and an arrangement for the joint care of their child, but they did not live together. At the time of her death, Erica was living with her grandfather.

Two witnesses testified that, in 2006 and 2007, Erica showed up at their respective homes, frantically seeking help because Williams was "after" her or chasing her. Others testified that Erica and Williams argued a lot, and one described Williams as abusive and controlling. Erica's friend Shiranda described Erica's relationship with Williams as "volatile."

On the evening of Saturday, April 28, 2007, Erica and Shiranda went to the Falcon Club in Waco. Shiranda drove, and just after parking, Williams appeared and told Erica that she could not go into the club. As Shiranda went into the club to use the restroom, Williams was holding Erica by the arms and telling her that she was not going to the club and was going to go with him. When Shiranda returned, Erica and Williams were gone.

On the next day (Sunday), Erica was not at her grandfather's house. Williams called there to say he was coming to get his son and his things for school the next day. Typically, Erica had made those arrangements. The State theorized that, because Williams knew Erica was dead, he needed to get their son so that her absence would not be noticeable. When Williams arrived that day to pick up his son, Erica's grandmother was there, was hesitant to let him take his son with Erica not there, and asked Williams if he had seen Erica. In response, Williams turned away from her. Two days later, Erica's mother began to worry about her, and she and Erica's grandfather went to Williams's house to ask about her. Williams told them that he and Erica had gotten into an argument in the car, that she had jumped out of the car window, that he had not hurt her, and that he did not know where she was. On the next day, Erica's mother filed a missing-person's report. Throughout the entire time period in which Erica was missing, Williams did not contact any of the persons (Erica's friends and relatives) he normally contacted when he needed to contact Erica.

On May 3, Williams got his car stuck next to a muddy country road near property that was formerly owned by his parents and with which he was familiar. He asked a neighbor, whom he was related to, for help getting his car unstuck, and told him he had been looking for a fishing spot. The neighbor's uncle, who was Williams's cousin, got yet another neighbor to come with a tractor to get Williams's car out of the mud. The uncle said that the pond where Williams was looking to fish did not have any fish in it, that Williams was not his usual self (he was quiet, rather than joking), that Williams had the strong odor like that of a dead animal, and that it was unusual for

Williams to have gone on the neighbor's property without permission. The neighbor with the tractor said he has seen someone fitting Williams's description open a gate and go on the property where the car was stuck and that the man's vehicle was the same one that he later pulled out of the mud that evening.

Several days later, Waco Police interviewed Williams, who stated that on the Saturday evening when Erica had last been seen, he and Erica had gotten in her car, with him driving, and they argued. He admitted he was mad at her for going to a club. When he slowed the car because of traffic, Erica jumped out of the car window, and he never saw her again.

Kimberly Roddy, the sister of Williams's cousin whom Williams had asked for help with his stuck car, was told by her mother that Williams's girlfriend was missing. Kimberly had also been told that Williams had gotten stuck while fishing. Acting on a hunch, on May 8, Kimberly went to the property with her brother (Williams's uncle who had helped get his car unstuck), and they began to look around. She saw a silver chain, then a clump of hair. The uncle, who was on horseback, reached the tank area and found a decomposing body in a shallow grave. The body was determined to be Erica's, based on identifying tattoos. She had no clothing on the top half of her body and was wearing blue jeans.

Williams was arrested a few days later, and at the time, he had a bag with "PCA" (a Waco company) shirts in it. Williams had a fresh blister on one hand; the State theorized he got it from digging the grave. Two abandoned vehicles were found near the grave. A shovel was found in one. In the other, decomposition was found on the

seat, along with hair and tissue on the floorboard. In the backseat were bags of women's and men's clothing. The women's clothing was determined to be Erica's. The men's clothing included a PCA shirt, sneakers, and jeans, which had Erica's blood on them. The jeans and sneakers were the same size as those on Williams when he was arrested. While he was incarcerated pre-trial, Williams approached another inmate about providing him with an alibi.

The medical examiner could not determine the anatomic cause of Erica's death because of decomposition, but based on all the circumstances, he determined that she died as the result of homicidal violence of undetermined etiology. A forensic entomologist who examined larvae, pupae, and maggots from her body testified that their age coincided with her body being placed outside on May 3.

The State's theory was that Williams murdered Erica on the night of April 28, took her body to his parents' former property, with which he was familiar and where he knew there were abandoned cars, and put her body in one of the cars. He then returned on May 3 and partially buried her body, but his car got stuck and others thus became aware of his presence at the location where her body was found on May 8.

Williams argues in his first issue that, while there may be evidence that he had something to do with her death, there is no evidence that he had the *mens rea* to intentionally or knowingly cause Erica's death or to intentionally cause her serious bodily injury and commit a clearly dangerous act that caused her death. *See* TEX. PEN. CODE ANN. § 19.02(b)(1, 2) (Vernon 2003). Instead, he argues, because her cause of

death was unknown, he just as well could have committed manslaughter or criminally negligent homicide.

A culpable mental state is invariably proved by circumstantial evidence. *Giddens v. State,* 256 S.W.3d 426, 434 (Tex. App.—Waco 2008, pet. ref'd); *see Dillon v. State,* 574 S.W.2d 92, 94 (Tex. Crim. App. 1978). The jury may infer intent from any facts in evidence that the jury determines prove the existence of an intent to kill. *Brown v. State,* 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). The issue on appeal is not one of theoretical possibility, but whether, under the circumstantial evidence, it is reasonable to infer that the defendant had the requisite culpable mental state. *See Dillon,* 574 S.W.2d at 95; *see also Hooper,* 214 S.W.3d at 14.

Based on Williams's conduct toward Erica before her death, including their volatile relationship and his anger for her going to a club and making her leave with him on the night of her disappearance, and his incriminating conduct after her disappearance, a rational juror could find, beyond a reasonable doubt, that Williams intentionally or knowingly caused Erica's death. The evidence is legally sufficient, and we overrule issue one.

Issue two asserts that the evidence is factually insufficient on *mens rea.* The Court of Criminal Appeals recently overruled *Clewis v. State,* 922 S.W.2d 126 (Tex. Crim. App. 1996) and factual-sufficiency review. *See Brooks v. State,* 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The court held that the *Jackson v. Virginia* legal-sufficiency standard is the only standard a reviewing court should apply in determining the sufficiency of the

evidence. *Id.* Because we cannot review the evidence for factual sufficiency, and because we have already reviewed it for legal sufficiency, we overrule issue two.

In his third issue, Williams asserts that the trial court abused its discretion in refusing to grant a mistrial. Early in voir dire by the trial court, a venireperson said that she believed she had read that Williams was purported to be a habitual criminal and that it might affect her ability to serve. She did not elaborate further, and the trial court made no comment. No other venireperson said that he or she had read or heard any media coverage. The venireperson was struck for cause.

Before the State began its voir dire, and outside the venire panel's presence, Williams suggested that the panel be quashed and also moved for a mistrial on the ground that the venireperson's statement essentially informed the panel that Williams had prior felony convictions. When the State suggested that the panel be asked if the venireperson's comment affected any of them (such as, whether any comment by any venireperson has been affected by another's comment), Williams asserted that the venireperson's "habitual" comment would be reinforced. During the defense's voir dire, the issue was not broached.

The trial court then denied the mistrial motion, and Williams did not request an instruction to disregard. When a party's first action is to move for mistrial (as opposed to an objection or a request for an instruction to disregard), the scope of appellate review is limited to whether the trial court erred in not granting the mistrial. *Young v. State,* 137 S.W.3d 65, 69-70 (Tex. Crim. App. 2004).

> We review a trial court's denial of a motion for mistrial for an abuse of discretion. *See Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). A mistrial is appropriate only for highly prejudicial and incurable errors. *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins,* 135 S.W.3d at 77. In most instances, an instruction to disregard will cure the prejudicial effect. *Wesbrook v. State,* 29 S.W.3d 103, 115-16 (Tex. Crim. App. 2000). An instruction to disregard is presumptively inadequate only in the most blatant cases; only offensive or flagrantly improper conduct warrants reversal when there has been an instruction to disregard. *Wilkerson v. State,* 881 S.W.2d 321, 327 (Tex. Crim. App. 1994).

*Pierce v. State,* 234 S.W.3d 265, 268 (Tex. App.—Waco 2007, pet. ref'd); *see also Archie v. State,* 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Archie,* 221 S.W.3d at 699.

To show that a trial court abused its discretion by refusing to quash a venire panel, the appellant must show that (1) other members of the jury panel heard the remark, (2) they were influenced by it to the prejudice of appellant, and (3) that the juror in question or any other juror who may have had a similar opinion was forced on the appellant. *Callins v. State,* 780 S.W.2d 176, 188 (Tex. Crim. App. 1989). Assuming that other venirepersons heard the comment at issue, nothing in the record shows that they were influenced or, if any were influenced, that they sat on the jury. Williams does not show harm. *See, e.g., McGee v. State,* 923 S.W.2d 605, 607-08 (Tex. App.—Houston [1st Dist.] 1995, no pet.); *Nelson v. State,* 881 S.W.2d 97, 101-02 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd); *see also Berkley v. State,* 298 S.W.3d 712, 713 (Tex. App.—San Antonio 2009, pet. ref'd); *Bottenfield v. State,* 77 S.W.3d 349, 356 (Tex. App.—Fort Worth 2002, pet. ref'd). Without a record that supports his claim of irreparable harm, Williams

cannot show that the trial court abused its discretion in refusing to grant a mistrial.  We

overrule issue three.

We affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed February 9, 2011
Do not publish
[CRPM]