

# IN THE
# TENTH COURT OF APPEALS

## No. 10-12-00071-CR

JERWOODY MOLER,

                                                  Appellant

 v.

THE STATE OF TEXAS,

                                                  Appellee

### From the 12th District Court
### Walker County, Texas
### Trial Court No. 25,314

## MEMORANDUM  OPINION

After a change of venue, a Grimes County jury found Appellant Jerwoody Moler

guilty of the murder of seventeen-year-old K'Lynn Kohr and assessed a life sentence

and a $10,000 fine.  Proceeding pro se, Moler appeals.[1]  We will affirm as modified.

### Sufficiency of the Evidence

We begin with Moler's second issue, which asserts that the evidence is legally

---

[1] After he was appointed counsel for this appeal, Moler filed a motion to proceed pro se.   In a hearing and after admonishing Moler, the trial court allowed him to proceed pro se and relieved appointed counsel.

insufficient to support the conviction. The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326, 99 S.Ct. at 2793. Furthermore, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13.

> Under the *Jackson* test, we permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.

. . . .

> [C]ourts of appeals should adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.

*Id.* at 15-17. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

Crockett Pegoda testified that in the fall of 2010, he had been K'Lynn's boyfriend for a year and four months. They were both seniors in high school, and they planned on getting married after their senior year. For her senior year, K'Lynn was living in a mobile home with her cousin Becca Crowell at the Tanglewood mobile home park in Huntsville. K'Lynn's aunt (Becca's mother) had arranged for them to live in the mobile home, and K'Lynn had just moved in.

On Saturday morning, September 4, 2010, K'Lynn and Crockett were going dove hunting, but K'Lynn did not wake up, so Crockett went hunting without her. After hunting, Crockett picked K'Lynn up around midday and took her to his house. He stayed at his house until about 3:00 p.m., when he left to go hunting again; she stayed there until around 4:30 or 5:00 p.m. and told Crockett that she left to go to Walmart to get dog food. They kept in touch by cell phone after Crockett left, and he last spoke with K'Lynn around 8:40 or 8:45 p.m. when he called her to decline her invitation to come over to eat dinner with her because his parents had told him to come home after hunting. That was K'Lynn's first night alone in the mobile home.

After he got home, Crockett tried calling K'Lynn at least twice between 9:30 and 10:00 p.m., but she never answered. The next day (Sunday), he tried calling her all day, but she never answered. Because K'Lynn had told Crockett that she was possibly going to see her family in Cleveland, Texas, he did not worry. On Monday morning, Crockett went bird hunting with his dad. Crockett was surprised that K'Lynn had not yet called him back, which was unusual for her, and she still was not answering his calls. After hunting, and now worried about K'Lynn, Crockett went to her mobile home. K'Lynn's locked car was there, the lights in the mobile home were off, and the door was locked. He called K'Lynn's aunt, who had a key, and the aunt and her then-boyfriend came over around 2:30 p.m.

The aunt's boyfriend unlocked the door, went in, and then came back out. He told them to stay outside and told Crockett to call the police. Crockett called 9-1-1 on his cell phone but did not know what to say or what to tell them to do, so he went inside and then told the 9-1-1 operator what he saw: K'Lynn lying on the floor with her throat cut and blood everywhere. He also told police that the blood looked dry and that K'Lynn was not moving or breathing. Crockett testified that K'Lynn had on the clothes that she had been wearing Saturday when she was at his house and that she never wore the same clothes for more than one day. K'Lynn had a dog, but it was not in the mobile home. Crockett was interviewed by police and testified that he had scratches on his hands and that police had photographed his hands. He said that his hands were scratched from walking through vines while hunting.

Huntsville police detective John French was one of the first police officers on the

scene. He found a white female lying on the floor with couch cushions on top of her. She was deceased and had numerous cuts. The kitchen floor looked like it had been cleaned; it was smeared, as if someone had used a towel to wipe something, but the towel or other item that had been used was not found. The oven was on the broil setting, and there was charred meat in it.

Riley Ortiz, a former sheriff's deputy who lived at Tanglewood, testified that around 8:30 or 9:00 p.m. on September 4, while walking his dog at Tanglewood, he came into contact with a man he did not know who was wearing a white shirt and jeans. At trial, Riley identified Moler as the man he saw that evening at Tanglewood. Riley spoke to him and said they only exchanged "pleasantries." Riley had also seen him at the pool area earlier in the evening. The pool was about 300 to 500 yards from K'Lynn's mobile home, and the wooded area between the pool and her mobile home was easily accessible. Later that evening, Riley was asked to come over to the mobile home of his neighbor Maria Rivas, who was there with her sister Yara Castaneda and Castaneda's daughter. They were concerned and described to Riley a man whom they had seen at Tanglewood, and, to Riley, the man that they described fit Moler's description.

On the next day (Sunday, September 5), Riley, who knew K'Lynn and her dog, found her dog at the playground and took it home. He then went to K'Lynn's mobile home with her dog and knocked, but no one answered. He put a note on the door to K'Lynn that he had her dog, and he checked every two hours or so on Sunday and then Monday to see if she had gotten his note. Finally, when Riley checked on Monday

afternoon, he found a group of people there and learned what had happened. Riley gave a written statement to Huntsville police at the scene; the statement detailed his involvement with K'Lynn's dog. Riley's statement was admitted, and on cross-examination, he admitted that it does not mention his seeing Moler at Tanglewood on the Saturday before K'Lynn was found murdered. Riley then said on re-direct that, after a conversation with Rivas, he realized that he needed to share with police the information about his Saturday evening encounter with the person that he identified as Moler. Riley explained that, when he wrote his statement on Monday at the scene, he did not think that what had happened on Saturday evening was relevant to her being found on Monday.

On cross-examination, Riley testified that he identified Moler in a photo lineup as the person he saw at Tanglewood. On the photo lineup, which was admitted, Riley wrote next to Moler's photo: "not 100% sure." Riley explained that, while he picked Moler's photo, "not 100% sure does not mean I wasn't sure," and that "a hundred percent is without a doubt. Now, of course, there is always doubt." On re-direct, Riley said that it is easier to make an identification in person than from a photo and that he was "a hundred percent" that his in-court identification of Moler was not incorrect.

Yara Castaneda, who lived in Houston, testified that she and her daughter, now age eight, were visiting Castaneda's sister, who lived at Tanglewood, over Labor Day weekend in 2010. On Saturday, September 4, Castaneda and her daughter went to the pool at Tanglewood around 6:30 or 7:00 p.m.; they were the only people there. Around 8:00 p.m., Castaneda saw Riley Ortiz, her sister's neighbor, walking his dog around the

pool area, and they said "hi" to each other. Then, "all of a sudden," a guy who Castaneda described as "white complected, kind of reddish hair, wearing baggy clothes"—came around the pool. He was wearing a white shirt and blue jeans. He said "hi, how are you doing," and Riley and the man "kind of bumped" into each other. She heard them say "hi," so Castaneda thought he was from the mobile home park.

He tried to open the gate to the pool, but it had a code and he could not open it. Castaneda asked her daughter to open the gate for the man, so her daughter got out of the water and opened the gate for him. As the man walked through the gate, Castaneda said he reached his hand inside his pants, grabbed something silver with his right hand, and put it behind his back. At the same time, Castaneda's daughter, who did not know how to swim, ran and jumped into the water with a "terrified face" and said, "mom, mom, mom, he had a knife, he had a knife." Castaneda grabbed her cell phone and, so the man would not know she had seen him, calmly called her sister to come pick them up because there was "a guy with a knife."

The man then came into the pool area and sat down with his hand behind his back, staring at Castaneda and her daughter. Because she was nervous and scared, she avoided eye contact with the man. He asked Castaneda if she was from there, and she "kind of looked at him." Castaneda's sister soon arrived with her car headlights shining straight on the man's face, and the man said, "shit," as if he were mad, and turned his face away from the headlights. Castaneda's daughter, who was still "real terrified," went straight from the pool to the car without picking up anything. Castaneda grabbed her sandals and towel and walked away from the man on the pool's

other side. She and her sister later spoke to Riley Ortiz that evening.

Castaneda testified that she had been shown a photo lineup, but she could not pick out the man at the pool. At trial, she could not identify that man as being in the courtroom.

Arnold Ortiz testified that Moler began working for him at his wholesale business in June of 2010. Arnold provided Moler with a cell phone and communicated with Moler on that phone on a regular basis; Arnold did not know of anyone else who used Moler's phone. Over time, Moler became trustworthy and was given additional responsibilities, including the code to the business's security system in August. Moler occasionally used the company vehicle, a 2002 Ford Explorer, and knew the access code on the vehicle's door to unlock it. The key was kept in the vehicle.

Arnold helped out Moler, including taking him to Walmart in late August to buy some clothing and household goods, including a set of steak knives. Arnold identified photos of himself and Moler with the four-piece set of knives at the Walmart check-out.

In the early morning hours of Monday, September 6, at around 12:45 a.m., Arnold was awakened by a text message from Moler's phone that asked Arnold where he was and whether he was still in Livingston. Arnold explained that he and his family customarily went to church in Livingston and spent the whole day there and that Moler was familiar with that. Arnold said that he responded by asking Moler by text where he was at and that Moler texted he was at a Huntsville restaurant eating breakfast. About fifteen minutes later, Arnold heard the roar of his Explorer going down the driveway. He texted Moler to bring it back, and Moler replied by text with something

to the effect of, "I can't, my life is on the line. I will call you from a secure phone." Arnold never heard back from Moler, and the vehicle ended up in Iowa.

Arnold called 9-1-1 and Huntsville police came over the next day. Arnold informed Huntsville police about the text messaging with Moler and showed them the messages. Huntsville police wanted to take Arnold's phone (a Blackberry) to Houston, but his office manager downloaded the messages to Arnold's computer. Arnold did not know if the downloading was successful because he never looked at it, and he did not know if the messages were ever printed.

Gary Shearer, a chief deputy with the Houston County Sheriff's Office, testified that in September 2010, he was a senior detective with Huntsville police and that he did forensics on digital equipment. He was asked to examine Arnold Ortiz's Blackberry phone; the phone had been connected to Arnold's computer to extract the messages, and the messages were deleted from the phone. The computer was sent to the Attorney General's office to have the computer examined, but none of the messages were recovered.

Doyle Self, Jr., an acquaintance of Moler's, testified that on the evening of September 5, Moler came to his house around 8:00 p.m. and they drank beer together. Moler had a bandage on one hand. Moler told Self that he had been drunk and that he fell and cut his hand. Sometime between midnight and 2:00 a.m., Self gave Moler a ride to Dead Lake Road, which was about five miles down Highway 30. That was the last time Self saw Moler. Self admitted that he had inaccurately told Texas Ranger Steve Jeter that he had gone to bed that night around midnight and that Moler had left Self's

house at midnight.

Huntsville Police Detective Eric Scott testified that after Moler was developed as a suspect, on September 7 he obtained and executed a search warrant for Moler's residence. He found a box of rubber—"like medical"—gloves that were similar to the gloves found under K'Lynn's body. He also saw blood on Moler's bathroom floor and door, and there was a sewing needle, thread, and bandages that looked like someone had been trying to sew something up.

Scott also found two Paula Deen-brand steak knives and learned that they were exclusive to Walmart. He then acquired the Walmart video of Arnold and Moler buying the four-piece knife set a week before K'Lynn's murder, and Scott bought an identical set of the knives; that set was admitted into evidence. Only two of the four knives were found in Moler's residence; no knife or sharp object was ever identified as the murder weapon.

Scott testified that he viewed a video from an MS Express store, and it showed Moler on Sunday at 4:24 p.m. with his right hand bandaged—his "ring finger and his pinkie finger were kind of taped together in a bandage." Also, Scott acquired Walmart video from about 5:00 a.m. on Monday, September 6 and said that still photos of that video show Moler with a bandage on his right hand. When Scott went to Iowa to transport Moler back to Texas, Moler had a bandage on his hand.

Scott further testified that he obtained video from Walmart that he said showed Moler checking out on Saturday, September 4 at 6:26 p.m. Scott said that still photos from that video show Moler and his right hand and that no bandage appears on his

right hand. Moler is wearing a dark-colored shirt.

Scott said that Moler was developed as a suspect in K'Lynn's murder based on information received from Riley Ortiz and Yara Castaneda and from Moler's stealing Arnold Ortiz's vehicle; Moler fit the description of the man that Riley Ortiz saw at Tanglewood and that was seen at the Tanglewood pool with a knife on that Saturday evening. Scott placed the time of the murder as Saturday evening after approximately 8:45 p.m., which was the last time that Crockett had spoken to K'Lynn on the phone. Scott determined that Moler's residence was a ten-to-fifteen minute walk (Moler did not have his own vehicle) from Tanglewood. Scott estimated that the walking time from the Tanglewood pool to K'Lynn's mobile home was just "minutes or less;" "it's not that far."

Dr. Joni McClain, the Dallas County deputy chief medical examiner, performed the autopsy on K'Lynn. She testified that K'Lynn's body had a total of seventeen sharp-force injuries, consisting of both incised wounds and stab wounds. K'Lynn also had contusions and abrasions on her scalp, neck, chest, and legs that were "fairly minor" blunt-force injuries and could be indicative of a struggle.

Several of the incised and stab wounds were to the arms and the hands, and Dr. McClain described them as "defensive wounds." Two of the wounds—one to the neck and throat area and one to the chest that cut the pulmonary artery—were the more severe wounds, and the chest wound caused a great loss of blood, which, along with the other wounds, caused K'Lynn's death. The cause of death was "sharp force injuries." Dr. McClain said that the steak knife was consistent with K'Lynn's wounds and was

capable of causing death or serious bodily injury.

On cross-examination, Dr. McClain said that fingernail scrapings from K'Lynn were collected and turned over, but she did not know if any DNA testing was done on them.

Steven Jeter, a Texas Ranger, participated with Huntsville police in the murder investigation and processed the crime scene with a now-retired Ranger and with Melinda Strange, a Huntsville police evidence technician. Jeter said that there was no sign of a forced entry, sexual assault, robbery, or burglary but that there was a "hell of a fight." He testified at length about the blood-spatter evidence at the scene, including:

- There had been an attempt to wipe or clean up blood on the linoleum kitchen floor.

- There was a blood-drip trail and drip pattern that was "very likely" consistent with a cut on someone's hand.

- There were three drops of blood on K'Lynn's arm that appeared to Jeter to be post-mortem and to be from a source other than K'Lynn—"somebody was right over the top of her." Jeter collected swab samples of those three spots of blood for DNA testing.

Jeter also testified about other key evidence:

- There were two "Latex" gloves under K'Lynn's body—one under her right cheek and one under her back. Jeter collected the two gloves for testing. One of the gloves had a burn mark that he associated with smoking a cigarette. From viewing the photograph of Moler's hand, Jeter opined that Moler was an obvious smoker because of the appearance of his fingers (dark staining of his index and middle fingers) and because of a possible burn mark on his index finger.

- Jeter recovered two knives from Moler's residence that were identical to the steak knife set that the State had bought; two of Moler's four-piece set were missing. Jeter did not believe that one of the knives recovered from Moler's residence was the murder weapon.

- The steak knives do not have a hand guard, and it would have been easy for a person's hand to slide up the knife; it would be "very possible" for someone using that knife to cut themselves. There appeared to be blood in Moler's residence, but it was not tested to determine if it was blood.

- When Moler was apprehended in Iowa on September 11, Moler's right hand was bandaged. Jeter photographed the cut on Moler's hand; it depicts a cut at the bottom crease of Moler's right pinkie and continuing through into his hand. Neither glove found at the scene had a tear on them.

- Jeter also recovered "Latex or plastic" gloves that were on the counter in Moler's kitchen. Those gloves were consistent with the gloves that Jeter found under K'Lynn's body.

- After Moler was apprehended, Jeter obtained a buccal swab from him for DNA testing.[2] The lab results confirmed that the DNA on the gloves and the three blood drops on K'Lynn belonged to Moler. Because the results were obtained in ten days and confirmed Moler as a contributor, Jeter did not have any of the other blood evidence tested. The fingernail scrapings from K'Lynn were not analyzed for DNA because Moler had no obvious signs of scratches and because Moler's DNA was found on K'Lynn's body and on the two gloves. Jeter thought that was enough evidence to convict Moler beyond a reasonable doubt, and he, along with the DA's office, decided that they did not need further testing.

Andrew McWhorter, the DNA section supervisor of the Texas Department of Public Safety Crime Lab in Houston, testified about the DNA results in this case, and his report was admitted. McWhorter first testified about his credentials and then explained what DNA is, how it is extracted from a sample and tested, and how comparisons are made. The comparison of a known sample to an evidence sample is expressed by stating that a person is either excluded from the evidence profile or cannot be excluded—that is, the person is included in the evidence profile. If the person is included, that is expressed statistically as "a probability of selecting another person who

---

[2] A known DNA sample from Crockett was also obtained and submitted for DNA analysis and comparison.

has that profile at random in the population and it's expressed as one in whatever." The statistic is based on a DPS and FBI database that has a certain number of individuals who are representative of particular sub-populations. If the statistic for a single-source DNA profile is over 1 in 297 trillion (a one followed by twelve zeroes, in comparison to what McWhorter said was the world population of 6.8 billion), the benchmark for scientific certainty is met and it can be said to a reasonable degree of scientific certainty that the individual is a source of that profile.

In this case, McWhorter extracted DNA from Moler's buccal swab and from a sample of K'Lynn's blood to use as a comparison to the evidence samples,[3] which included the two gloves found under K'Lynn and the three swabs of blood taken from the surface of her arm. The gloves had "red staining," plus McWhorter swabbed the inside of the glove's palm and fingers for DNA from tissue, which would include skin or sweat.

For the two gloves, McWhorter said that their DNA profiles were consistent with a mixture of K'Lynn's and Moler's DNA and that they could not be excluded as contributors to those DNA profiles. For one glove, the probability of selecting an unrelated person at random who could be a contributor to that glove's DNA profile was approximately 1 in 29.27 million for Caucasians, 1 in 711.2 million for Blacks, and 1 in 45.35 million for Hispanics. For the other glove, the probability was approximately 1 in 2.567 million for Caucasians, 1 in 30.45 million for Blacks, and 1 in 3.591 million for Hispanics.

---

[3] McWhorter also obtained a DNA profile from Crockett's known sample.

McWhorter testified that for one swab from K'Lynn's upper left arm, its profile was consistent with a mixture of K'Lynn's DNA and Moler's DNA and that Moler could not be excluded as a contributor. The probability of selecting an unrelated person at random who could be a contributor to that DNA profile was approximately 1 in 512.6 million for Caucasians, 1 in 7.42 billion for Blacks, and 1 in 2.705 billion for Hispanics. The other swab from K'Lynn's upper left arm had the same results as the first glove mentioned above.

For the third swab from K'Lynn's arm—this one from her left elbow— McWhorter said that the DNA was consistent with a mixture of Moler's DNA and K'Lynn's DNA but that Moler could not be excluded as the contributor of the major component of that profile. McWhorter's report states that K'Lynn also could not be excluded as a contributor at six of the sixteen loci. He testified that the probability of selecting an unrelated person at random who could be the source of the major component of that DNA profile was approximately 1 in 119.6 sextillion for Caucasians, 1 in 7.278 septillion for Blacks, and 1 in 41.72 septillion for Hispanics. McWhorter said that a sextillion is a 1 with 21 zeroes behind it, and it is far beyond what is needed for scientific certainty. His report states: "To a reasonable degree of scientific certainty, Jerwoody Moler is the source of the major component of this profile (excluding identical twins)."[4] In other words, McWhorter testified that, regarding the spot of blood on K'Lynn's left elbow, the chance of it being the DNA of a person other than Moler was 1 in 119.6 sextillion.

---

[4] Jeter also testified about the DNA results in McWhorter's report.

McWhorter also did a DNA examination of the two steak knives recovered from Moler's residence. The partial DNA profile from the handle of the first knife was consistent with Moler's DNA. The mixed DNA profile from the other knife was unknown, and Moler and K'Lynn were excluded as contributors. McWhorter also tested a third smaller knife that was recovered from Moler's upstairs porch, and while K'Lynn was excluded as a contributor to the mixed DNA profile, Moler could not be excluded. In conclusion, McWhorter said that no forensic evidence linked any of those three knives to K'Lynn.

On cross-examination, McWhorter said that neither glove had a tear or puncture. McWhorter also said that he did not do DNA testing on K'Lynn's fingernail scrapings that had been submitted but that he did perform testing on a vaginal swab and that Crockett Pegoda was the contributor of the DNA from a sperm cell fraction to a reasonable degree of scientific certainty.

The indictment alleged that on or about September 6, 2010, Moler intentionally or knowingly caused K'Lynn's death by stabbing her with a knife that, in its manner of use or intended use, was capable of causing death or serious bodily injury. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). The jury found Moler guilty as charged in the indictment.

Among his sufficiency complaints, Moler asserts that there is no evidence that he intentionally or knowingly caused K'Lynn's death because there was no evidence of animosity or disagreement between them. Motive, however, is not an element of murder. *Clayton v. State,* 235 S.W.3d 772, 781 (Tex. Crim. App. 2007). Also, a culpable

mental state is invariably proved by circumstantial evidence. *Giddens v. State,* 256 S.W.3d 426, 434 (Tex. App.—Waco 2008, pet. ref'd); *see Dillon v. State,* 574 S.W.2d 92, 94 (Tex. Crim. App. 1978). The jury may infer intent from any facts in evidence that the jury determines prove the existence of an intent to kill. *Brown v. State,* 122 S.W.3d 794, 800 (Tex. Crim. App. 2003). The issue on appeal is not one of theoretical possibility, but whether, under the circumstantial evidence, it is reasonable to infer that the defendant had the requisite culpable mental state. *See Dillon,* 574 S.W.2d at 95; *see also Hooper,* 214 S.W.3d at 14.

A knife is not a deadly weapon per se. *Lafleur v. State*, 106 S.W.3d 91, 95 (Tex. Crim. App. 2003). An object is a deadly weapon, however, if the actor intends a use of the object in which it would be capable of causing death or serious bodily injury. *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000); TEX. PENAL CODE ANN. § 1.07 (a)(17)(B) (West Supp. 2013). Dr. McClain said that the steak knife was capable of causing death or serious bodily injury, that K'Lynn's wounds were consistent with the steak knife, and that K'Lynn's body had a total of seventeen sharp-force injuries that were the cause of death.

If the weapon used is not a deadly weapon per se, the intent to kill may be shown by the manner of its use along with the nature and extent of the wounds inflicted on the victim. *Boazman v. State,* 501 S.W.2d 894, 896 (Tex. Crim. App. 1973); *Martinez v. State,* 699 S.W.2d 910, 913 (Tex. App.—Amarillo 1985, no pet.) ("Although a knife is not a deadly weapon per se, it can qualify as a deadly weapon by demonstrating the manner of its use, its size and shape, and its capacity to produce

serious bodily injury or death.") (citing *Hawkins v. State,* 605 S.W.2d 586, 588 (Tex. Crim. App. 1980)); *see also Ervin v. State,* 333 S.W.3d 187, 200 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("Intent may also be inferred from the means used and the wounds inflicted, and is a factual matter to be determined by the jury from all the facts and circumstances in evidence.") (citing *Hemphill v. State,* 505 S.W.2d 560, 562 (Tex. Crim. App. 1974)). The intent to kill may be inferred from the use of a deadly weapon in a deadly manner, and if a deadly weapon is used in a deadly manner, the inference of intent to kill is almost conclusive. *Watkins v. State,* 333 S.W.3d 771, 781 (Tex. App.— Waco 2010, pet. ref'd) (citing *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993)).[5]

K'Lynn suffered seventeen sharp-force injuries, consisting of both incised wounds and stab wounds. Several of the wounds were defensive wounds to K'Lynn's arms and hands. The two most severe wounds were a deep stab wound to the chest that cut her pulmonary artery and a gaping and deep incised wound across her throat. Dr. McClain also said that three of the wounds were inflicted after K'Lynn was already dead.

Moler additionally argues that no murder weapon was found and that the evidence is insufficient to show that a knife was used to murder K'Lynn. Dr. McClain

---

[5] In his sufficiency challenge, Moler cites Code of Criminal Procedure article 38.17, but it is plainly inapplicable in this murder case and, in any event, only applies to the jury charge. *See* TEX. CODE CRIM. PROC. ANN. art. 38.17 (West 2005); *Provost v. State,* 205 S.W.3d 561, 569 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing *Whisenant v. State,* No. 10-01-00305-CR, 2003 WL 1090504, at *5 (Tex. App.—Waco Mar. 12, 2003, pet. ref'd) (not designated for publication) (stating article 38.17 applies to accomplice testimony, testimony of a person acting covertly for a law enforcement agency who is not a licensed peace officer, treason cases, and perjury cases)).

testified that the cause of death was "sharp force injuries" and that the steak knife was consistent with K'Lynn's wounds and was capable of causing death or serious bodily injury. And Moler's insinuation that the evidence is insufficient because the State did not find and offer into evidence the actual murder weapon is misguided; the State was not required to put the actual murder weapon into evidence.

Moler also asserts that the State did not prove a specific date and time of death and that there is no evidence that places him at the scene of the murder on or about September 6, 2010. K'Lynn's body was found on September 6, and the evidence strongly suggests that she was murdered on the evening of September 4. With the indictment's allegation that the murder was committed "on or about" September 6, 2010, the State was not required to prove a specific date and time of death, nor was it required to prove that the murder was committed on September 6, 2010. *See Smith v. State,* 959 S.W.2d 1, 26 (Tex. App.—Waco 1998, pet. ref'd) ("When an indictment alleges that the offense occurred 'on or about' a certain date, the State need only prove that the accused committed the offense at some time prior to the filing of the indictment and within the limitations period.").

Moler primarily asserts that the evidence is insufficient to show that he was the person who murdered K'Lynn. He argues that the DNA evidence "at most shows that at some point and time" he and K'Lynn "had contact" and that his mere presence gives rise to only a suspicion. Moler also questions the "eyewitness" testimony placing him at Tanglewood and further argues that the "meager circumstantial evidence" did not allow the jury to reasonably infer that he committed the murder. Rather, Moler argues,

Crockett Pegoda, K'Lynn's boyfriend, was the likely murderer.

The evidence, viewed in the light most favorable to the jury's verdict, shows the following:

- Approximately a week before K'Lynn's murder, Arnold Ortiz, Moler's employer, bought a four-piece set of steak knives for Moler.

- On Saturday, September 4, 2010, at 6:26 p.m., Moler was at Walmart, and video of him checking out showed that he did not have a bandage on his right hand.

- Moler did not have a vehicle, but his residence was a ten-to-fifteen minute walk from the Tanglewood mobile-home park where K'Lynn lived and was murdered.

- Riley Ortiz, who also lived at Tanglewood, saw Moler at Tanglewood around 8:30 or 9:00 p.m. on Saturday, September 4, 2010. Riley had also seen Moler earlier in the evening at the Tanglewood pool.

- At the Tanglewood pool that evening, Yara Castaneda's daughter let a man into the pool area by opening the gate for him around 8:00 p.m. As he came in, Castaneda saw the man reach in to his pants, grab a silver item with his right hand, and place it behind his back.

- Castaneda's daughter ran and jumped into the water with a terrified face and told her mother that the man had a knife. The man sat at the pool area with his hand behind his back and appeared to be mad when Castaneda's sister arrived to pick up her and her daughter. Castaneda was concerned and met with Riley Ortiz, and Riley said that the man that Castaneda described fit Moler's description.

- K'Lynn's mobile home was 300 to 500 yards from the pool and was just a few-minutes' walk.

- Crockett Pegoda, K'Lynn's boyfriend, last spoke by phone to K'Lynn around 8:40 or 8:45 p.m. on Saturday evening, and he tried calling her at least twice between 9:30 and 10:00 p.m., but she never answered. He also could not reach her by phone on Sunday, September 5, or Monday, September 6.

- On September 5, Riley Ortiz found K'Lynn's dog at Tanglewood and took it to her mobile home, but no one would answer the door that day or the next day.

- On the evening of September 5, Doyle Self drank beer with Moler at Self's residence. Self gave Moler a ride between midnight and 2:00 a.m.

- Around 1:00 a.m. on September 6, Moler took Arnold Ortiz's Ford Explorer. When Arnold texted Moler to bring it back, Moler responded by text that he could not because his life was on the line. On September 11, Moler was apprehended in Iowa in Arnold's vehicle.[6]

- When K'Lynn was found murdered on the afternoon of Monday, September 6, she was wearing the same clothes that she was wearing on Saturday.

- Two latex-type gloves were found under K'Lynn's body, and other gloves of the same type were also found in Moler's residence. There was evidence of Moler's DNA on the two gloves; Moler could not be excluded as a contributor. For one glove, the probability of selecting an unrelated person at random who could be a contributor to that glove's DNA profile was approximately 1 in 29.27 million for Caucasians. For the other glove, the probability was approximately 1 in 2.567 million for Caucasians.

- K'Lynn's sharp-force injuries were consistent with the steak knives that Arnold had bought for Moler. Only two of the four steak knives were found in Moler's residence; two were missing.

- The steak knives do not have a guard on the handle, and a person using the knife could cut himself because the person's hand could slide up from the handle to the blade.

- Detective Scott said that a store video showed Moler with a bandaged right hand on Sunday, September 5 around 4:30 p.m. Self said that Moler had a bandage on one hand on the evening of September 5. Walmart video showed Moler with a bandage on his right hand around 5:00 a.m. on September 6. When Moler was apprehended in Iowa on September 11, Moler's right hand was bandaged; he had a cut at the bottom crease of his right pinkie and continuing through into his hand.

- There was blood-drip trail and drip pattern in K'Lynn's mobile home that was consistent with a cut on someone's hand, and there had been an attempt to clean up blood on her kitchen floor.

- Three drops of blood on K'Lynn's arm appeared to be post-mortem and from

---

[6] A jury "may draw an inference of guilt from the circumstance of flight." *Clayton v. State,* 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).

someone who was over K'Lynn's body. Moler could not be excluded as a contributor to the blood's DNA profile.

- For one of the three blood drops on K'Lynn's arm, Moler could not be excluded as the contributor of the major component of that drop's DNA profile. The chance of it being the DNA of a person other than Moler was 1 in 119.6 sextillion. "To a reasonable degree of scientific certainty, Jerwoody Moler is the source of the major component of this profile (excluding identical twins)."

- Moler could not be excluded as a contributor to the other two drops. For one drop, the probability of selecting an unrelated person at random who could be a contributor to that DNA profile was approximately 1 in 512.6 million for Caucasians. For the other drop, the probability of selecting an unrelated person at random who could be a contributor to that DNA profile was approximately 1 in 29.27 million for Caucasians.

The State admittedly did not establish Moler's motive to murder K'Lynn. The State's theory was that K'Lynn was stabbed to death on the evening of September 4, after approximately 8:45 p.m. Moler, who was seen at the Tanglewood pool around 8:00 p.m. with a knife, was also seen by Riley Ortiz at Tanglewood around 8:30 or 9:00 p.m. Moler somehow gained unforced entry into K'Lynn's mobile home and stabbed her to death, using a steak knife that did not have a guard on the handle. While violently stabbing K'Lynn, Moler cut himself on his right hand and bled at the crime scene; he unsuccessfully attempted to clean up his blood while wearing latex-type gloves, which he left under K'Lynn's body. On the following evening, Doyle Self gave Moler a ride to Arnold Ortiz's residence, where Moler took Ortiz's vehicle and fled the State because he feared being caught because his blood was at the crime scene.

Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found that Moler committed the offense of murder beyond a reasonable doubt. We overrule issue two.

**Brady**

In his first issue, Moler contends that the State committed a *Brady* violation by withholding favorable evidence. A prosecutor has an affirmative duty to turn over material, favorable evidence to the defense. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963); *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999). To determine whether a prosecutor's actions violate a defendant's due-process rights, we employ a three-part test. We consider whether: (1) the prosecutor failed to disclose evidence; (2) the evidence is favorable to the accused; and (3) the evidence is material (*i.e.*, whether a reasonable probability exists that the result of the proceeding would have been different if the evidence had been disclosed to the defense). *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); *Little*, 991 S.W.2d at 866.

Without the failure to disclose evidence, there is no *Brady* violation. *See Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). An open-file policy is generally sufficient to satisfy *Brady* as well. *Id.* at 407. Also, *Brady* does not apply to evidence known to the defense. *Jones v. State,* 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.) (citing *Hayes v. State,* 85 S.W.3d 809, 814-15 (Tex. Crim. App. 2002)).

Moler asserts that the State withheld DNA evidence from K'Lynn's fingernail scrapings and that, because K'Lynn fought with her assailant, the DNA evidence from K'Lynn's fingernail scrapings would identify her assailant. But the State did not fail to disclose this evidence, and Moler's trial counsel was fully aware of it. In the hearing on Moler's motion for new trial, Moler's trial counsel testified that he had been provided the State's file, including the DNA results, that he employed a DNA expert, and that

other than as a ground for a continuance during trial, he did not formally request DNA testing of the fingernail scrapings.[7] Moler's trial counsel admitted that, from the State's file, he knew that the fingernail scrapings had not undergone DNA testing. Accordingly, there was no failure to disclose regarding the fingernail scrapings.

Moler next argues that the State withheld blood evidence that Jeter recovered from the crime scene and from Moler's residence. Specifically, he asserts that the State did not have DNA testing performed on trace hair recovered from K'Lynn's body, the blood trail in the mobile home, the wiped blood on K'Lynn's kitchen floor, and the alleged blood in Moler's residence. But, as with the fingernail scrapings, there was no failure to disclose. Nor was the State required to have those items tested for DNA, and the State's decision to not have any of these items tested is not a *Brady* violation. In short, Moler's trial counsel knew what evidence had and had not been tested and did not request any other testing before trial. Moreover, there is no testimony that, had any of the untested items undergone DNA testing, the results would have been favorable to Moler.

Finally, Moler asserts that the State withheld videotape of him at Walmart on the evening of September 4 at or about 8:30 p.m., and Moler argues that this videotape is exculpatory because it places him "in another part of town" at the time that he was seen at Tanglewood.

Detective Scott initially testified that he had video of Moler at Walmart on

---

[7] Moler suggests that DNA testing of K'Lynn's fingernail scrapings may identify her assailant because she may have scratched her assailant, but there is no evidence that K'Lynn did scratch her assailant or that the fingernail scrapings even contain human tissue.

Saturday evening around 8:00 or 8:30 p.m.—"It was that evening, it was - - I don't know the exact time, it was around probably 8:30, maybe 8:15, 8:30."  In response to a question of if there was "another set of pictures that show him there on Saturday, September 4th at around 8:30 p.m.," Scott said, "Yes, sir, there is a video of him at Wal-Mart that day."

During a break, Moler's attorneys told the trial court that the video "apparently doesn't exist" and then requested a continuance to try to locate it because it may be at Walmart.  Thereafter, Scott testified that he could not locate that video.  Scott was then asked about Moler's bank records and testified that they showed him checking out of Walmart at 6:28 p.m.

During the next break, Moler's counsel again requested a continuance because of the missing video of Moler at Walmart on Saturday around 6:30 p.m. and alleged that it was potentially exculpatory because it would show what he was wearing and because it placed him in another part of Huntsville about two hours before he was seen at Tanglewood.  The State responded that Moler's being at Walmart two hours earlier was not exculpatory because that left Moler plenty of time to walk to Tanglewood, and the State reiterated that the defense had been allowed to inspect all of the evidence that they wanted to see.  The trial court denied the request for a continuance and indicated that there was plenty of time to locate the missing video.  After the conclusion of testimony that day, the State notified the trial court that the video had been located and a copy had been given to the defense; it was agreed that the State would try to "pull some still photographs off of it."

On the next day of trial, Scott was called again to testify.  He again clarified that

Moler was at Walmart on September 4 around 6:25. Also, he had acquired the video of that transaction, and "still shots" that were time- and date-stamped show Moler on September 4 at 6:26 p.m. The photos depict Moler in a dark-colored shirt. After the State rested, Moler's counsel unsuccessfully moved for a mistrial, asserting several grounds, including the allegedly late revelation of Moler wearing a blue shirt at 6:30 p.m. on September 4. The State responded that Moler's wearing a different shirt one and a half or two hours before he was seen at Tanglewood was not exculpatory.

We agree with the State that the video is not exculpatory, largely because Scott corrected his original testimony that he thought the video showed Moler at Walmart around 8:00 or 8:30 p.m. on September 4. Also, even if the video was disclosed at trial, Moler cannot show prejudice because his counsel had the opportunity to question Scott about it after Scott had located the video and because there is no showing that the defense would have pursued a different trial strategy if the information had been known early.[8] *Khoshayand v. State,* 179 S.W.3d 779, 783 (Tex. App.—Dallas 2005, no pet.); *Fox v. State,* 175 S.W.3d 475, 490 (Tex. App.—Texarkana 2005, pet. ref'd); *see also Wyatt,* 23 S.W.3d at 27; *Little,* 991 S.W.2d at 866. No *Brady* violation is shown with respect to the September 4 Walmart video of Moler. We overrule issue one.

### Attorney's Fees

In his third issue, Moler asserts that the trial court erred in assessing attorney's fees in the amount of $26,500.73 against Moler because Moler was indigent. The State

---

[8] In closing argument, Moler's counsel argued that reasonable doubt existed because Moler was shown with a dark shirt at 6:30 p.m., which contradicted the testimony that he was wearing a white shirt at Tanglewood at 8:00 p.m.

concedes that Moler was indigent and that there is no evidence that his financial status changed; we agree. *See Watkins,* 333 S.W.3d at 781-82. Accordingly, we sustain issue three.[9]

Having sustained issue three, we modify the trial court's judgment by deleting the $26,500.73 assessment of attorney's fees. And having overruled issues one and two, we affirm the judgment as modified.


REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed as modified
Opinion delivered and filed April 24, 2014
Do Not Publish
[CRPM]

---

[9] Moler filed several supplemental briefs that raise new issues, but because he did so without leave of court, we will not address his new issues. *See* 10TH TEX. APP. (WACO) LOC. R. 12(f); *Gardner v. Reindollar,* No. 10-13-00249-CV, 2014 WL1271776, at *1 (Tex. App.—Waco Mar. 27, 2014, no pet. h.) (mem. op.).