In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00255-CR**
_____

**RAYCHYL DANIELLE PHILMON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B190440-R**

**MEMORANDUM OPINION**

Raychyl Danielle Philmon ("Philmon") was convicted of capital murder and sentenced to life without the possibility of parole within the Texas Department of Criminal Justice. *See* Tex. Penal Code Ann. § 19.03(a)(8) (murder of an individual under the age of 10 years old). In three issues on appeal, Philmon challenges the sufficiency of the evidence, arguing that evidence is insufficient to demonstrate she

1

knowingly or intentionally caused the death of her child, evidentiary issues, and the assessment of reimbursement fees. We affirm as modified.

## Background

As stated above, Philmon was charged with the capital murder of her eighteen-month-old son, Ross.[1] The undisputed evidence showed that in March 2019, Philmon arrived at the former Baptist Hospital in Orange, with her son in her arms. The facility was no longer a functioning hospital, but Philmon arrived at the old emergency room entrance, which still bore the name "Emergency Room" on the front of the entrance. An outpatient medical facility was now located at this entrance. According to two eyewitnesses at the medical facility, Ross appeared to be in distress, so they rushed outside to help the child.

Samantha Blevins testified that she works at the outpatient facility within the old hospital and noticed Philmon approach the old emergency room door holding a child and looking for help. Blevins met Philmon at the door of the facility, and Philmon told her that Ross was "breathing[,] [but] I just can't get him – he just won't arouse, won't wake up." Two nurses came outside to assist Philmon. Philmon did not give Ross to Blevins, but while Blevins called 911, the other nurse managed to

---

[1] We refer to the victim with a pseudonym to conceal his identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

get him away from Philmon. Blevins described Philmon and Ross's attire as unusual, noting both Philmon and child were "very clean[,]"and that Philmon was wearing pajama pants, with no shoes, and her hair was "soaking wet." Blevins testified that as soon as she saw Ross, "I knew[,]" he was "already gone[,]" because Ross was not breathing, and was blue in the face. According to Blevins, Philmon acted as though she wanted their help, but did not let them help, and it took a while for the nurses to get Ross away from Philmon.

Shelia Rizzato was the other nurse at the hospital that day when Philmon arrived with Ross. When Rizzato went to the door, she did not see Ross, only his legs, which she described as "bluish looking." As Blevins called 911, Rizzato went to Philmon to ask her about her child. Rizzato took Ross out of Philmon's arms, turned him over and noticed that he was blue around his lips and eyes, with a bruise on his cheek. Her first thought was "someone has done harm to him[,]" and she did not believe that Ross was alive. Rizzato started CPR, but did not feel the child breathing, did not detect a pulse or movement, and Ross did not respond to stimuli. She testified, "[t]here was nothing." She observed that Ross was clean, wearing a diaper and t-shirt, and he had not urinated or defecated on himself. She noted that this was peculiar because when a person dies, they lose control of their bodily functions. She attempted chest compressions, but when the ambulance arrived, the paramedics took Ross away from her. She testified that as she attempted CPR on

3

Ross, Philmon was next to her asking questions. When the paramedics took the child, Rizzato touched Philmon's back and noticed her hair and her clothes were wet, as though she had showered or gone swimming. Rizzato stated the day was "chaotic" and that Philmon was screaming, and distraught, but as they questioned Philmon, she would become "agitated[,]" appeared "upset[,]" and did not cry.

Cody Caples stated he is a captain with the Orange Fire Department. He explained that along with their duties as firefighters, his team also responds to medical emergency calls. In March 2019, he and a fellow crew member were taking their fire truck to get fuel when the dispatcher announced a medical emergency at the old Baptist Hospital emergency room entrance. Caples and his coworker immediately went to that location to assist. Upon arrival, Caples observed a woman attempting chest compressions on a child in her lap. Caples immediately retrieved his medical equipment, oxygen, and a defibrillator. He explained that a defibrillator will shock the heart to get back to normal rhythm and will detect whether a patient has a heartbeat. Caples did not feel a pulse when he laid Ross on the ground, nor did the defibrillator detect a pulse. Caples did not observe any signs of life in the child. After chest compressions were started on Ross, Caples asked Philmon whether she was Ross's mother. He struggled to understand a time frame from Philmon regarding Ross's injuries, with Philmon stating that Ross was awake and playing when she went to take a nap, but after she woke up, she found him unresponsive. As Caples

4

was attempting chest compressions on Ross, he observed bruising on the child's chin, "like about the size of fingertips." Caples asked Philmon whether she grabbed Ross in this area, which she denied. He also noticed bruising around Ross's eyes, which he believed suggested Ross was "choking or just somehow quit breathing." Philmon continued to insist that she just fell asleep while Ross was awake. At this time, other first responders arrived, bringing machinery that would force oxygen into Ross's lungs and manually breathe for him. Caples stated these efforts failed. Caples continued attempting life-saving measures for several minutes in the hope that he would save Ross's life.

Tiffany Post testified she is a paramedic who was called to the old hospital on that day after receiving a notification of a patient in cardiac arrest. Once she arrived at the old hospital, the firefighters brought Ross to the ambulance, laid him on a stretcher, and continued to attempt CPR. Post continued the life-saving measure in the ambulance. Post stated that "the baby was in asystole, which was a complete flat line across the screen[.]" In her assessment, she noted that Ross was cold to the touch, his nail beds were purple, his eyes were "raccoon eyes" with pools of blood as someone who had "trauma to the face or head" or "passed away[,]" and petechial hemorrhaging in his eyes. All of this conveyed to Post that Ross was deceased. She observed that Ross had on a clean shirt and diaper, his body was clean, and that he had bruising on his face, that Post "was able to line up my three fingers here and my

5

thumb here, and they all fit perfectly with the bruising on his face[,] [t]hey looked like fingerprints on his face." She attempted to intubate Ross and observed that he had "rigor in his jaw," a sign of "prolonged death." His chest was not moving from the air being pumped into his lungs because rigor had set in his chest and ribcage. After Ross was transported to the hospital, resuscitation efforts were terminated and Ross was pronounced dead. Before transport, Post noticed Philmon standing at the back of the ambulance, and described her as "dishelved[.]" During cross-examination, Post admitted that she did not report that Ross's arms and legs showed signs of rigor mortis, and stated she could not estimate how long Ross had been deceased.

Michael Roush testified that he is employed as a certified peace officer with the City of Orange Police Department. He arrived at the old hospital while the paramedics were still attempting lifesaving measures on Ross. He learned that the resuscitation efforts were not succeeding and secured the scene. He spoke to Philmon and identified her and Ross. He observed that Ross appeared to be just over a year old, wearing a t-shirt, diaper and had bruising on his chin and neck area. Roush said he spoke to Philmon and she provided details of the events leading to their arrival at the old hospital. Philmon told Roush that she stayed up late with the child the night before and that she placed him down for a nap around 10 o'clock that morning. She described their home as a double-wide trailer and stated that Ross

6

sleeps on a fold-out couch in the living room. She then went to the main room in the home and fell asleep. When she woke up, Ross was next to her in the bed, unresponsive. She panicked, claimed that she could not find her phone, and drove Ross to the old hospital in Orange seeking help. He described Philmon's demeanor as "dry[,]" stating she "seem[ed] kind of a little concerned for the child[,]" noting she was rocking back and forth on the bench, but not crying. During cross-examination, Roush agreed that Philmon was screaming, but would not agree she was crying, describing her behavior as "animated[,]" but not "emotional[.]" Video from Roush's body camera was admitted at trial.[2]

Angela Dillahunty testified that she is a registered nurse with St. Elizabeth Hospital in Beaumont; she manages the forensic nursing program at that location. After Ross was brought to St. Elizabeth Hospital and pronounced deceased, Dillahunty was called to assess the child, as is common in cases of child deaths. She recalled that Philmon was not at the hospital yet, and she began to "look the child all over from head[-]to[-]toe and document any injuries that I find on them." She stated that Ross was undressed and that she could see bruises on him. According to Dillahunty, there were bruises on his face and arm, along with a couple of other injuries. Photographs of Ross at the hospital were admitted at trial. Dillahunty

---

[2] Officer Dylan Jinks also testified at trial. He assisted Roush in securing the scene at the hospital, including taking pictures of Ross and the vehicle Philmon was driving that day. Those pictures were admitted at trial.

detailed the injuries on his body, observing several bruises. She noted particularly that the bruises on his ear were concerning:

> Bruises to the ear are always concerning in children – well, any person – because the ear doesn't have a very good blood supply. The ear is cartilage; and, so, it takes a lot of force to cause a bruise in that area. So, bruises to the ear are always concerning.

During cross-examination, Dillahunty acknowledged she could not tell the time frame of when Ross got the bruises on his body. She also explained that a "layover death[,]" is a death that occurs when an adult rolls over on a sleeping child, usually only occurs in small infants, because older children are strong enough to move out of the way.

Dillahunty next spoke with Philmon seeking to gather information about any injuries or illnesses Ross may have had before he died. Philmon told Dillahunty that she fed Ross leftover chicken and mashed potatoes that morning, and that she had gone to bed at 10:30 that morning, and Ross was in his bed. Philmon could not recall the time that she woke up that day, but said that when she did wake up, Ross was in her bed and his lips were blue. She said that as soon as she woke up, she brought Ross to the old hospital in Orange. According to Dillahunty, Philmon denied that Ross had been sick before he died, and her only explanation of the bruises on his face, was that she shook his face when it was blue. Dillahunty stated that Philmon was not crying and kept asking how Ross was doing and if he was alive. A doctor came into the family room, where Philmon was waiting, and told Philmon that Ross

8

was pronounced deceased. She stated that Philmon got "very quiet and stopped speaking and was just staring at the floor." A police officer asked Philmon to come to the police station to give a statement and Philmon stated, "I'm ready. Let's go get this over with." Dillahunty found this comment unusual, stating "I've seen probably hundreds of children, unfortunately, who have been deceased. I've never had, that I can recall, another time when a parent did not immediately ask to go see their child; and she did not ask to go see her child. She left with law enforcement."

Before her retirement, Officer Janois Grizzaffi was employed as a detective with the Orange County Sheriff's Department. When she first met Philmon, she was sitting on the curb outside the old hospital with her arms on her knees. She introduced herself and spoke to Philmon. She described Philmon as "cooperative[,]" permitting the officers to go into her home to investigate. Philmon told Grizzaffi that the night before her son died, she went to her mother's home and stayed out very late. Philmon relayed that she and Ross slept late the next morning, had breakfast, and then around 10:30 a.m. she laid Ross down for a nap on the pull-out couch in the living room. She then went to her bed and lay down to take a nap. When she awoke, she found Ross in bed next to her, with blue lips. She claimed that he was limp and unresponsive. She picked him up, attempted to search for her phone, to no avail. She then got into her truck and rushed Ross to the old hospital. Philmon stated that she intermittently attempted to resuscitate Ross by giving him CPR while

9

driving to the hospital. Grizzaffi described Philmon's demeanor during this conversation as "flat and just not much emotion."

Grizzaffi went to the hospital where Ross was transported. Grizzaffi stated she was present when Dillahunty examined Ross and she noticed the bruising around Ross's lower jaw and chin area. Once Philmon arrived at the hospital where her son was taken, she was escorted to a family room and Grizzaffi joined her in this room. Grizzaffi questioned Philmon about the bruises on Ross's face, but Philmon was "hesitant…speaking, …kind of stumbled around; [and] said she didn't know and had not seen any bruising." Grizzaffi was present when the doctor told Philmon that Ross was deceased, describing Philmon's demeanor as follows:

> [She was] [j]ust staring straight ahead. She didn't really even acknowledge the doctor. She -- she was right beside him; so, I know she heard what he said. But she never looked at him. She didn't ask him any questions. She didn't offer anything to him as he was explaining what he had to say or even when he asked any questions of her. She just didn't respond to him.

Eventually, the doctor left the room. Grizzaffi told Philmon that standard procedure required that they get a formal statement from her regarding her child's death. Philmon agreed to give a statement and went with Grizzaffi to the police station.

At the police station, Grizzaffi and another detective questioned Philmon in a recorded interview. Grizzaffi stated that Philmon's statement was "for the most part, the same[,]" as her statement earlier in the day. Philmon allowed the detective to search her phone. Photographs and messages from the phone were admitted into

10

evidence. A photograph of Ross with Philmon's mother taken the day before he died was admitted. This photograph showed no bruising on Ross's face. Screenshots of text messages between Philmon and an unknown person from the night before Ross died contained these messages:

> Philmon: "I have to bathe."
>
> . . . .
>
> Philmon: "And u gonna go get the plan b[?]"[3]
>
> . . . .
>
> Philmon: "Or giving me the cash[?]"
>
> . . . .
>
> Philmon: "I already got one of them motherfuckers I can barely afford."

Philmon did not ask for her phone back after this interview and obtained another phone. Grizzaffi obtained a search warrant for the new phone and stated that within twenty-four hours of Ross's death, Philmon signed up for three dating sites.

Officer Hugh Shane Wilkinson of the Orange County Sheriff's Department went to Philmon's home to investigate after the death of her son. He described Philmon's home as a camper or travel trailer with a living room area, including a fold-out bed, a small bathroom, and a main loft bedroom. Philmon gave Wilkinson

---

[3] Grizzaffi explained that Plan B is an over-the-counter pill that prevents a fertilized egg from attaching to the uterus, preventing pregnancy.

consent to enter her home. Wilkinson entered through an unlocked door and began to search for Philmon's cell phone. He located Philmon's cell phone, retrieved the number assigned to it, and put it in "airplane mode" to stop communication to the phone to protect the integrity of the phone and collected it as evidence. Photographs of the trailer were admitted at trial. In the process of searching for the cell phone, Wilkinson discovered several used hypodermic needles, drug paraphernalia, and a small bag of what he suspected was crystal methamphetamine. He described the loft bed of the trailer as in "disarray[,]" noting it was cluttered, with items such as an ashtray and printer. On the printer, he found two more baggies of suspected drugs, which he believed to be marijuana and crystal methamphetamine. On the steps leading into the bathroom of the trailer, he located a fresh dirty diaper.

Following his investigation of the trailer, Wilkinson attended Ross's autopsy and determined he needed to conduct a follow-up investigation with Philmon. He located Philmon the next day, in Lake Charles, Louisiana, where she was selling cleaning supplies from her vehicle in a Walmart parking lot. Wilkinson told Philmon that he wanted to speak with her further about her son's death and asked her to come back to Orange County. He described Philmon as "extremely hesitant[]" to speak to them, offering reasons as to why she could not return, including lacking money for gas and needing to speak to an unknown male first. Wilkinson offered to interview Philmon in Louisiana or to give her money to return to Texas. When questioned

about Ross's autopsy or funeral, Philmon said she did not want to discuss it and that she did not have money to hold a funeral for her son. Philmon told Wilkinson she was trying to "run from the reality of the situation[.]" Philmon provided an email to the detective but did not want to leave or speak to Wilkinson, so he left. Eventually, Philmon agreed to come to the police station to give a statement.

Jessica Johnnie stated she is a certified police officer. At the time of Ross's death, she was a detective sergeant with the Orange County Sheriff's Department. She testified that on the day Ross died, she was coordinating the investigation with the various officers responding to the scene and hospital. She went to the hospital and upon arrival viewed Ross in just a diaper. She observed that he had bruises on his face, jaw, and chin, along with some other bruises. Medical staff told her that they did not attempt any lifesaving measures on the child because he was already deceased. She was in the family room when the doctor told Philmon that Ross was deceased and he described Philmon's reaction as not "much [of a] reaction, very flat."

When Philmon voluntarily went back to the sheriff's office for an interview, Johnnie and Grizzaffi interviewed her. During the interview, Philmon kept her head on the desk most of the time, appeared agitated and did not make eye contact with the detectives. She testified that Philmon appeared to be "trying to cry[,]" but was "really unemotional." She felt that Philmon did not ask "any kind of questions you

13

would – you would think a normal – normally would be asking." Philmon provided a sworn statement admitted into evidence. In the statement, Philmon denied intentionally harming Ross, admitted to drug use, but denied Ross had access to the drugs, and reiterated that she found him, limp and unresponsive, next to her in bed after she woke up from a nap.

Johnnie then attended Ross's autopsy. After the autopsy was conducted, Johnnie again wanted to interview Philmon. She located Philmon the next day at a Walmart parking lot in Louisiana where Philmon was selling cleaning products out of the back of her truck. Philmon did not ask about the details of the autopsy, and would not come back to Orange for a new interview.

On March 22, Philmon was located again and agreed to an interview. She was given her *Miranda* rights and voluntarily waived those rights to speak to the detectives. Johnnie testified that during the interview, Philmon "[s]poke in a low tone and would become agitated when I asked her specific details. She was a little bit more emotional than the -- the last time[,] . . . . [s]he was crying real tears[.]" An audio and video recording was made of this interview and not shown to the jury. Johnnie testified that Philmon was "adamant[]" that Ross did not have any preexisting conditions before he died. She told Johnnie that she fed Ross spaghetti and meatballs, something Johnnie explained was different than Philmon's previous statements. According to Philmon, she laid Ross in his bed and went to take a nap in

14

her bed. When she woke up, Ross was in bed with his face away from her, and to Philmon, it was obvious something was wrong, he was not breathing. Philmon picked him up, attempted CPR in the bed, lasting about a minute before she tried to find her cell phone to call 911. When she could not find her cell phone, she left and took him to the hospital. Philmon estimated the time frame was five minutes from when she discovered Ross to leaving in her vehicle. When questioned about Ross's dirty diaper found in her home, Johnnie testified that Philmon was "hesitant[,]" claimed she did not remember, but "ultimately she said that she did change him[,] but she didn't wipe him or anything." Philmon told Johnnie she did not clean herself, but did put clothes on because she was in her underwear.

Dr. John William Ralston stated that he is a forensic pathologist and conducted Ross's autopsy. He described his educational background, and typical procedures for conducting an autopsy, noting that he has conducted over 4,000 autopsies in the course of his career. He stated that Ross had several bruises on his body including "three red-purple bruises on the left cheek of the face[,] . . . three red-purple bruises on the right side of the chin[,] . . . bruise on the front of his right upper arm a little bit less than 1/2 an inch in diameter[,] [and] had a purple bruise on the back of his left elbow." He stated that because the bruises were "reddish-purple[,]" they occurred fairly recently. He observed "petechial hemorrhages[,]" small blood vessels that ruptured in his eyes. He explained this type of injury is often

observed when someone cannot breathe, or something is blocking their airway. He described the bruising around his face as "significant[.]"

> Well, if you'll notice, we're looking at the far right-hand side here. There's three almost parallel bruises on the left side of the face, which would match finger imprints. On the left side -- sorry. On the right side of the chin, there's three bruises there as well. They're more separate and round. That would be more consistent with a thumbprint.
>
> . . . .
>
> This is showing us what's known as the "frenula." That's f-r-e-n-u-l-a. That's that little bit of tissue that connects your lip to your gums. And there's bruising and hemorrhage in that area, which is consistent with pressure being placed over the mouth.
>
> . . . .
>
> You would not see this as part of CPR or intubation. This is direct pressure over the mouth, causing the bruising.
>
> . . . .
>
> I mean, you could receive a blow directly to your eye and have hemorrhage on one side and not the other. But hemorrhages like this in both eyes with no exterior bruising -- he doesn't have black eyes -- and with hemorrhages within the mouth, especially at the frenula, and the bruises around the mouth are all consistent with manual suffocation.

Ralston noted that Ross's blood did test positive for methamphetamine, but not in a fatal amount. During cross-examination, Ralston agreed that it is possible for Philmon, who is a large woman, to roll over on Ross and suffocate him, but stated that scenario does "not account for the bruising in the mouth." Ralston noted that he has seen children who have died from someone rolling over on them, but "it's in a

16

setting where you have four or five kids in one bed; and it's always the smallest one that gets rolled over on. But in those cases, occasionally you'll see hemorrhages in the eye; but you don't typically see the hemorrhages in the mouth and the bruising around the mouth, indicating that something was physically there pressing on it." Ralston concluded that in his opinion, Ross died by homicide via manual suffocation in the setting of child abuse.

The defense called two witnesses, and Philmon did not testify at trial. First, Philmon's father testified that Philmon "loved [Ross] with all her heart[,]" contending that Philmon "was always real nice to him." According to Philmon's father, he never saw Philmon mistreat Ross. Philmon's Father did not believe that Philmon would ever intentionally harm Ross.

Philmon's ex-boyfriend Stuart Davidson testified that he lived with Philmon for several months when Ross was a young baby. Davidson stated that Ross was a happy child, that Philmon treated Ross "pretty good[,]" and never hurt Ross. According to Davidson, Philmon had a "bad" methamphetamine problem, leading to what the defense coined "meth sleep[.]" Davidson explained that "meth sleep" occurs "when you stay up too long on it and then your body just gives out and you just - - you just go to sleep." He stated that when he lived with Philmon, they both used drugs including methamphetamines, and she would, at times, "meth sleep[,]" making it impossible to wake her up. At times he would have to kick or push her,

17

insisting, she would not wake up. He recalled one incident when Philmon took Ross to go take a nap. He found Ross crying because he was "pinned" between Philmon and the couch. He explained that Philmon is a large woman, and that he needed help to roll her over to get Ross out and to not let her hit the ground. He testified that Ross was in distress and that Philmon did not remember doing this to her child.

At the conclusion of trial, the jury found Philmon guilty of the offense of capital murder, rejecting the lesser included offense of manslaughter, and she was automatically sentenced to life imprisonment without the possibility of parole. Philmon timely appealed.

## Issue One

In her first issue, Philmon challenges the sufficiency of the evidence arguing the evidence is insufficient to prove that Philmon knowingly or intentionally caused the death of Ross. *See* Tex. Penal Code Ann. § 19.03(a)(8).

## Standard of Review

In reviewing a defendant's claim asserting the evidence in his trial does not support the verdict, we use a familiar standard of review. We review the evidence admitted in the trial in the light favoring the jury's verdict, and we decide whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the jury's

responsibility to fairly resolve conflicting testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13.

**Analysis**

A person commits the offense of murder if she:

(1) intentionally or knowingly causes the death of an individual[.]

*See* Tex. Penal Code Ann. § 19.02(b)(1).

A person commits the offense of capital murder if she:

(a)… commits murder as defined under Section 19.02(b)(1) and:

(8) the person murders an individual under 10 years of age[.]

*See* Tex. Penal Code Ann. § 19.03(a)(8).

The indictment alleged that Philmon

on or about March 18, 2019…did then and there intentionally or knowingly cause the death of an individual, namely, [Ross], an individual younger than 10 years of age, by manual suffocation[.]

Whether the defendant acted while having the required mens rea, that is the state of mind required under a criminal statute to establish the defendant is guilty, is a question of fact that the jury decides from the direct and circumstantial evidence admitted during the defendant's trial. *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998)). Jurors may rely on circumstantial evidence to decide whether a defendant

19

acted intentionally or knowingly in causing another's death, so they may look to the circumstances surrounding the crime, circumstances that usually include, as they do in Philmon's case, evidence showing what she said and did before and after arriving at the hospital, together with the nature and extent of the victim's injuries. *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020)[4] (citations omitted); *see also Ex parte Weinstein,* 421 S.W.3d 656, 668 (Tex. Crim. App. 2014). "Mental culpability is a question of fact to be determined by the jury from all the facts and circumstances in evidence." *Walter v. State*, 581 S.W.3d 957, 973 (Tex. App.—Eastland 2019, pet. ref'd) (citing *Hemphill v. State*, 505 S.W.2d 560, 562 (Tex. Crim. App. 1974)). "Intent is of such a nature that it is most often proven through circumstantial evidence surrounding the crime." *Id*. (citing *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex. Crim. App. 1991), overruled on other grounds by *Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992)). "[T]he verdict will withstand a sufficiency challenge as long as the combined and cumulative force of all the circumstances permits the conclusion that the jury was rationally justified in finding the defendant guilty of each element of the crime beyond a reasonable doubt." *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

---

[4] This opinion contained both published and unpublished text. We are citing to the unpublished text.

Viewed in the light most favorable to the verdict, the evidence supports the jury's conclusion that Philmon knowingly or intentionally caused the death of Ross. While there was testimony that Philmon was a large woman, abused drugs, and had occasions when she went into a "meth sleep," possibly leading to her unknowingly rolling over on Ross, the jury could have reasonably decided not to believe that testimony. *See Gilbert v. State*, 575 S.W.3d 848, 859-60 (Tex. App.—Texarkana 2019, pet. ref'd) (citations omitted) ("The jury is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may 'believe all of a witness['] testimony, portions of it, or none of it."). The jury was free to believe that Philmon viewed Ross as a burden as shown by her text messages the night before he died, that she and Ross were alone that day in the trailer, that she was substantially bigger than he was, that she caused the injuries on his body, and that she tried to hide the evidence by changing his diaper and cleaning him before coming to the hospital that day. The jury heard evidence on the extent of Ross's injuries, was shown photographs that Ross did not have those injuries the night before his death and heard expert testimony that concluded Ross died by manual suffocation based on his injures at death. *Alexander v. State*, 229 S.W.3d 731, 740 (Tex. App.—San Antonio 2007, pet. ref'd) ("[Appellant's] intent may be inferred from her actions and statements during and after the incident, as well as from the extent of [her child's] injuries, the relative size and strength between [Appellant] and [her child], and their

21

relationship."); *see also Gilbert*, 575 S.W.3d at 860 (noting that we give almost complete deference to the jury's determination of credibility). The jury also heard testimony from several eyewitnesses who testified about Philmon's demeanor that day, describing her as unemotional on that day, not crying, and noting that she did not act like other parents whose child had just died. There was also testimony that Philmon joined three dating websites within twenty-four hours of her son's death, she left Texas to sell cleaning supplies, and that she did not want to plan his funeral. *See Giddens v. State*, 256 S.W.3d 426, 434 (Tex. App.—Waco 2008, pet. ref'd) ("[A] culpable mental state can be inferred from the acts, words, and conduct of the accused.").

From this evidence, including Philmon's statements to medical personnel and law enforcement that Ross did not suffer from any medical conditions or have any injuries before he died, the jury rationally could have found Philmon knowingly or intentionally caused the death of her child by manual suffocation as alleged in the indictment. *See* Tex. Penal Code Ann. § 19.03(a)(8); *Williams*, 294 S.W.3d at 683 ("[C]ircumstantial evidence can be sufficient to prove culpable mental state; in these types of injury to a child cases, there is rarely direct evidence of exactly how the child's injuries occurred, which is why the culpable mental state may be inferred from circumstantial evidence."). We overrule her first issue.

22

**Issue Two**

In her second issue, Philmon argues that the trial court erred by allowing the admission of her statement to law enforcement in violation of Tex. Code of Crim. Proc. Ann. art. 38.22. Specifically, Philmon contends that the trial court's decision to allow a law enforcement officer to testify about her statement, rather than offering the original, recorded statement, violated 38.22, providing for the admission of a recorded or oral statement by a defendant. *Id.*

**Standard of Review**

We review the trial court's decision to admit evidence under an abuse of discretion standard. *Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). "Generally, all relevant evidence is admissible." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009); Tex. R. Evid. 402. Relevant evidence is that which has any tendency to make the existence of any consequential fact more or less probable than it would be without the evidence. Tex. R. Evid. 401. When determining whether evidence is relevant, it is important for courts to examine the purpose for which the evidence is being introduced. *See Moreno v. State*, 858 S.W.2d 453, 464 (Tex. Crim. App. 1993). In determining whether a particular piece of evidence is relevant, the trial judge should ask whether a reasonable person would believe that the evidence is helpful in determining the truth or falsity of any fact of consequence. *Montgomery v. State*, 810 S.W.2d 372, 376 (Tex. Crim. App. 1991).

23

**Analysis**

Assuming without deciding that there was error by not admitting the recorded custodial interview into evidence, Philmon has failed to demonstrate harm. "Error in the admission of evidence is non-constitutional error subject to a harm analysis under Rule 44.2(b)[.]" *Jabari v. State*, 273 S.W.3d 745, 754 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (citing Tex. R. App. P. 44.2(b); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). Rule 44.2(b) requires that we disregard the alleged error unless it affected Philmon's substantial rights. *See* Tex. R. App. P. 44.2(b); *Hernandez v. State*, 176 S.W.3d 821, 824 (Tex. Crim. App. 2005). A substantial right is affected when the alleged error had a substantial, injurious effect or influence on the outcome. *See King v. State,* 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).

Article 38.22 section 3 of the Texas Criminal Code of Procedure states the following regarding oral statements during custodial interrogation:

> Sec. 3. (a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> > (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
> > (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

24

(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

(4) all voices on the recording are identified; and

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

(b) Every electronic recording of any statement made by an accused during a custodial interrogation must be preserved until such time as the defendant's conviction for any offense relating thereto is final, all direct appeals therefrom are exhausted, or the prosecution of such offenses is barred by law.

(c) Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

(d) If the accused is a deaf person, the accused's statement under Section 2 or Section 3(a) of this article is not admissible against the accused unless the warning in Section 2 of this article is interpreted to the deaf person by an interpreter who is qualified and sworn as provided in Article 38.31 of this code.

(e) The courts of this state shall strictly construe Subsection (a) of this section and may not interpret Subsection (a) as making admissible a statement unless all requirements of the subsection have been satisfied by the state, except that:

(1) only voices that are material are identified; and

(2) the accused was given the warning in Subsection (a) of Section 2 above or its fully effective equivalent.

Tex. Code of Crim. Proc. Ann. art. 38.22 § 3.

Philmon does not dispute that the statement was made during a custodial interrogation or that she was properly admonished of her *Miranda* rights before giving the statement. Philmon contends that the officer should not have been allowed to testify at trial regarding her oral statements during the custodial interrogation, and that a copy of the recorded statement should have been admitted and shown at trial as required by article 38.22. Philmon does not provide this Court with any authority to support this argument. It is undisputed that the trial court did not limit Philmon's use of the video during trial. The trial court told Philmon's trial counsel in a hearing outside the presence of the jury, the following:

> As to your first objection with regards to the State questioning the defendant regarding the oral statement of the defendant while the defendant was in custody, that -- your first objection will be overruled. As long as Article 38.22 is satisfied, I believe the State has a right to question the detective about that interview. The defense has a right, of course, to play the video if the defense would like to do that; and that video is available for cross-examination. So, therefore, your first objection is overruled.

Philmon's trial counsel was provided a copy of the custodial interrogation, but chose neither to admit the video at trial, nor to cross-examine the officer about the video. Additionally, our review of article 38.22 shows there is no mandate in the Code of Criminal Procedure that requires the recorded statement to be shown to the fact finder. More to the point, there is no bar, once article 38.22 has been satisfied, to the admission of oral testimony by the investigating officer of what the defendant said during the interview. *See* Tex. Code of Crim. Proc. Ann. art. 38.22 § 3.

26

Consequently, there is no harm when the defendant is given a copy of the custodial interview, provided the opportunity to admit the evidence at trial or cross-examine the witness by admitting the contested evidence, and chooses not to do so. We overrule her second issue.

## Third Issue

In her final issue, Philmon disputes the trial court's assessment of reimbursement fees in her judgment of conviction totaling $15,336.12, although she was found indigent and provided a court-appointed attorney. The State concedes error in the assessment of reimbursement fees against Philmon. We sustain her last issue.

## Conclusion

While we affirm Philmon's conviction, both parties agree that the trial court erred in its assessment of reimbursement fees in its Judgment of Conviction. Since the record does not support the award of $15,336.12 for the reimbursement of attorney's fees, we modify the judgment by deleting the reimbursement fees awarding of $15,336.12 and replace it with $0.00. *See Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013) (concluding judgment should be reformed to remove assessment of attorney's fees because there was no finding in the record that an indigent defendant was able to repay the costs of court-appointed counsel).

We note that the trial court's judgment also contains a clerical error because it incorrectly states that Philmon was charged and convicted of an offense under section 19.03(a)(8) of the Texas Health & Safety Code, whereas the jury's verdict reflects that she was convicted of a violation of section 19.03(a)(8) of the Texas Penal Code. *See* Tex. Penal Code Ann. § 19.03(a)(8). This Court has the authority to modify the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). Accordingly, we modify the trial court's judgment to reflect that Philmon was convicted of violating section 19.03(a)(8) of the Texas Penal Code.

AFFIRMED AS MODIFIED.

JAY WRIGHT
Justice

Submitted on May 2, 2023
Opinion Delivered March 6, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Wright JJ.